# THE CONSOLIDATED GAS COMPANY *vs.* THE MAYOR AND CITY COUNCIL OF BALTIMORE ET AL.

*Taxation—Distinction Between Franchise and Easements of a Corporation—Occupation of Streets by Mains of a Gas Company an Easement Subject to Taxation as Property of the Company—Bonded Indebtness of a Corporation Not Assessable as Part of the Property of the Corporation—Improper Mode of Ascertaining Value of Gas Company's Easement in Highways—Appeal From Tax Assessment.*

A franchise in a special privilege conferred by the State on individuals, and does not involve an interest in land, although, when the franchise is exercised, its use may require the occupancy of land or the acquisition of an easement in land.

The franchise of a corporation is not taxed under Code, Art. 81, otherwise than by including it as an element which enhances the value of the shares of the capital stock; but when property, or an easement, is acquired under the franchise, such property is subject to taxation apart from the tax on the stock.

The use to which a franchise permits an easement to be put is an essential element in placing a valuation on that easement for purposes of taxation.

An easement enjoyed in the land of a public highway may be assessed and taxed as real estate owned by the party entitled to such easement.

The right of a gas company to occupy with its mains and pipes the soil of the streets and alleys of a city is a franchise, but the actual occupation of the streets in pursuance of the franchise is an easement in land; and such easement may be assessed for taxation as real estate owned by the company.

In assessing for taxation the property of a corporation under Code, Art. 81, the assessors are not authorized to include as part of the property the bonded indebtedness of the corporation.

Under Code, Art. 81, secs. 2, 92 and 210, the bonds of a corporation secured by mortgage on property in this State, and owned by residents of this State, are valued and assessed for purposes of taxation to the owners thereof. And there is no statutory provision subjecting the same bonds to an additional imposition as part of the taxable value of the assets of the corporation.

The Appeal Tax Court of Baltimore City assessed the easement of a gas company in the streets in the following manner: ' The capital stock, bonds and obligations, upon which a dividend or interest was paid, were added together and treated as being the total value of the corporate property. From this total the Tax Court deducted the assessed value of the company's real estate and also a sum arbitrarily chosen as representing the tangible personal property owned by the corporation. The residuum was divided by two, leaving the sum of $6,000,000, and this was treated as the assessable value of the easement of the company in the highways of the city. *Held*, that under the existing statutes this process was not a lawful method by which to value the easement for taxation, because the bonded indebtedness of a corporation cannot be charged against it in ascertaining the value of its property; and also because the value as signed to the stock, personal property, &c.. in the above calculation was arbitrary, and the mode in which the amount of the assessment for the easement was arrived at was not the result of judgment as respects its value.

*Held*, further, that since there had been no valid assessment the burden of proof, on appeal from the action of the assessors, is not on the gas company to show that the assessment was erroneous.

This Court can not be required to sit as a Board of Review to revise the amount of the valuation placed by assessors upon property for taxation, but when the record shows that a valuation has been imposed in a capricious or unwarrantable way, instead of by the exercise of judgment, then such a valuation would not be an assessment at all.

Appeal from the Baltimore City Court (STOCKBRIDGE, J.)

The cause was argued before McSHERRY, C. J., FOWLER, BRISCOE, PAGE, BOYD, PEARCE and SCHMUCKER, JJ.

*Edgar H. Gans* and *W. Calvin Chesnut*, for the appellant.

*W. Cabell Bruce* and *Sylvan H. Lauchheimer*, for the appellee.

McSHERRY, C. J., delivered the opinion of the Court.

The Consolidated Gas Company of Baltimore is a corporation duly formed under the laws of Maryland.   In the year 1904 it was assessed by the Appeal Tax Court of Baltimore City, for the purposes of taxation, with sundry parcels of real estate valued at $2,697,791; with 79,000 services at $158; and with 455½ miles of gas mains at $1,131,640; making a total of $3,987,431.   This total was increased for 1905 to $4,026,997.   On September the 23rd, 1904, the following notice was sent to the company by the Appeal Tax Court: "This is to notify you that it is the purpose of the Appeal Tax Court to increase the assessment on your mains, pipes and other construction located in, on, under or over the public highways of Baltimore City, so as to include the value of the easement enjoyed by you in said highways, and that on Thursday, September 29th, 1904, at 12 o'clock, you will be given an opportunity to make such statements and present such proofs as you may desire, to show *why* an additional assessment of $6,000,000 *should not* be placed on said real property.   Thereafter the Court may enter an increased assessment thereof, according to its *best judgment* and information in the premises."   The company appeared by its counsel.   No evidence was adduced by either side, but the company's counsel insisted that the contemplated or projected assessment of six millions of dollars, could not be legally made in the form or by the method proposed.   On the day following, the Appeal Tax Court entered its conclusions in these words: "Additional assessment on mains, pipes, and other construction located in, on, or over public highways of Baltimore City, so as to include the valuation of the easements enjoyed by said company in said highways, $6,000,000."   From that action, or determination the Gas Company appealed to the Baltimore City

Court. Upon the trial of that appeal evidence was offered with respect to the method pursued by the Appeal Tax Court in arriving at the sum of six millions of dollars as "the valuation of the easements enjoyed by said company in said highways;" and propositions of law, embodied in prayers, were presented, with a view of raising the question as to the right and authority of the city to tax the particular easement involved; and the further question as to the regularity of the mode adopted by the Appeal Tax Court in reaching the result to which it came. The Baltimore City Court rejected all the prayers of the Gas Company, but granted four out of the eight prayers presented by the city. The Court, sitting without a jury, passed an order sustaining the action of the Appeal Tax Court; and from that order this appeal was taken.

There are two questions in the case. First, had the city the *power* to increase the prior assessment on the mains, &c., by the addition of $6,000,000, so as to include, by that addition the taxable value of what the Appeal Tax Court describes as the *easements* enjoyed by the company in the highways; and secondly, if it did have that power, has it *properly* and *lawfully* exerted it?

It is not denied by the appellant that the Legislature *could* make provision for an independent assessment of the intangible, incorporeal right called by the company a *franchise*, but claimed by the city, in view of the facts, to be an *easement*— the right to occupy a certain space beneath the surface of the streets with gas mains and service pipes; but it is maintained, on behalf of the appellant, that the General Assembly did not intend by existing enactments to allow the Appeal Tax Court to assess as real property the right, privilege or franchise to occupy the streets with gas mains; because that right, by whatever name you call it, like the franchise to carry on business, forms part of the value of the company's capital and is taxable only through its shares of stock. It is obvious, when these two contentions are brought into juxta-position, that, in order to determine the first inquiry with which we have to deal, the exact nature of the right in question, under existing

conditions, must be definitely ascertained.    It must be ascertained, however, not as a mere abstraction nor purely from a philosophical standpoint, but especially and specifically with reference to, and in the light of, previous adjudications by this Court as applied to the actual facts in evidence.    It is a question of taxation which is before us.

"An easement is a liberty, privilege or advantage without profit which the owner of one parcel of land may have in the lands of another:    *    *    *    An easement, although only an incorporeal right and appurtenant to another, the dominant, tenement, is yet properly denominated an interest in land which constitutes the servient tenement, and the expression, "estate or interest in lands, 'when used in a statute is broad enough to include such rights, for an easement must be an interest in or over the soil."    14 *Cyc.* 1139.    In every instance of a private easement—that is, an easement not enjoyed by the public—there exists the characteristic feature of two distinct tenements—one dominant and the other servient.    On the other hand, a franchise is a special privilege conferred by government on individuals, which does not belong to the citizens of the country generally by common right.    2 *Wash. Real Prop.*, 303.    A franchise does not involve an interest in land—it is not real estate but a privilege which may be owned without the acquisition of real property at all.    The *use* of a franchise *may* require the occupancy, or even the ownership, of land; but that circumstance does not make the franchise itself an interest *in* land.    To define the *nature* of a thing by the *accidents* which are employed in its use, is to confound the thing itself with the agencies applied in its adaptation.    Because land *may* be required in putting a franchise into effective operation, it does not follow that the franchise *is* land, or an interest *in* land.    But an easement is quite a different thing.    It is essentially and inherently an interest in land.    It is an estate—a dominant estate imposed upon a servient tenement.    To which of these two distinct and dissimilar classes does the right of the Gas Company to occupy with its mains the sub-

surface of the streets belong, in the contemplation of the revenue and tax laws of Maryland?

It will be found upon examining some of the cases that there is occasionally, in the arguments of counsel, a want of exactness in the use of terms, and now and then the *right* to do a particular thing—which *is* the franchise—is confused with the *results* achieved in the exercise of the right, and those *results* are inaccurately spoken of as the franchise. The *right* to occupy the streets with gas mains is a *franchise*—the actual *occupation* of them in that way pursuant to the franchise is the acquisition of an *easement*. You must distinguish between the *right* to do the thing, and the *interest* acquired in the soil by the exercise of that right. The right of a railroad company to be, and to build a road, is a franchise from the State; the road-bed acquired by purchase or condemnation, is an easement altogether distinct therefrom, though obtained as a result of the exercise of that pre-existing franchise. It is strictly accurate to say, "The right of a gas company to lay its pipes and to use the streets of a city for the purposes of laying pipes to convey gas is a franchise, and can only be conferred upon a corporation by the Legislature." *State of Ohio* v. *Cinn. Gas Co.*, 18 Ohio St. 262. It is equally correct to declare, "The right to use the public streets of a city for the purpose of laying gas pipes therein is, in my opinion, a franchise which alone the State can confer." *Jersey City Gas Co.* v. *Dwight*, 29 N. J. Eq. 242. In each of these cases, and in many more that might be cited, the *right* to do the thing spoken of, is the *franchise*. And so in *Tuckahoe Canal Co.* v. *Tuckahoe, &c., R. Co.*, 11 Leigh (Va.) 78, it was said: "Now, I take a *franchise* to be (1) an incorporeal hereditament; and (2) a privilege or authority vested in certain persons by grant of the sovereign (with us, by special statute) to exercise powers or to do and perform acts which without such grant they could not do or perform. Thus, it is a *franchise* to be a corporation, with power to sue and be sued, and to hold property as a corporate body. So it is a *franchise* to be empowered to build a bridge or keep a ferry over a public stream, with a

right to demand tolls or ferriage; or to build a mill upon a public river, and receive tolls for grinding, &c.    But the *franchise* consists in the incorporeal right; the property acquired is not the franchise.    A bank has a right to purchase a banking house; when purchased is the house a franchise?    Surely not, for it is corporeal, whereas a franchise is incorporeal." In *Bridgeport* v. *N. Y., &c., R. Co.*, 36 Conn. 266, it was held that a franchise does not include property gained by the exercise thereof.

The distinction is clear between a franchise, as such, and the property acquired for the use of the franchise.    The naked, unused, slumbering franchise is property, but it is property concerning the assessment of which *in that condition* for purposes of taxation, the statutes do not make provision, otherwise than by including it as an element which enhances the value of the shares of the capital stock.    But when the franchise is brought into activity and is availed of to accomplish the ends it was designed to effect, the property acquired under it becomes amenable to the tax laws apart from the tax on the stock and its value, as an easement, if an easement it be, may be largely augmented by the use to which the franchise enables that property or easement to be put.    "They," said the Court of Appeals of New York in *People* v. *Tax Comrs.*, 174 N. Y. 441, "they (tangible chattels in the public highway) have no assessable value worthy of notice except through the actual and constant use made of them as incidental to the special franchises.    The value of either resides in the union of both and can be practically ascertained only by treating them as an unit.    Unless assessed together both cannot be adequately assessed.    A man of judgment in valuing a wagon, and especially in estimating its earning capacity, does not pass upon the body, wheels, top and tongue separately.    We regard the tangible property as an inseparable part of the special franchises mentioned in the statute, constituting with them a new entity, which as a going concern can neither be assessed nor sold to advantage except as one thing, single and entire." We cite this to show, if precedent be needed to support such

a self-evident proposition, that the use to which a franchise
permits an easement to be put, is an essential element to be
considered in placing a valuation on that easement for pur-
poses of taxation.

What, then, is the *thing* assessed and taxed in this case?
Is is the mere *right* to occupy the streets below the surface
with mains and pipes—which is the franchise; or, is it the *ease-
ment* acquired, through the franchise, by the actual occupancy
of the highways in that manner?   Ostensibly it is the latter;
and the right to include the value of that easement as an ele-
ment in fixing an assessment on the tangible property em-
ployed in availing of that easement is, we think, no longer an
open question in this State since the decision in *The Appeal
Tax Court* v. *Union R. Co.*, 50 Md. 274.   In that case it ap-
peared that the tracks of the Union Railroad Company, within
the city of Baltimore were, to a considerable extent, con-
structed in a tunnel under the bed of Hoffman street, a public
highway of the city, and another portion of the road within
the city, not in a tunnel, was also to a considerable extent,
within the limits of public highways.   The company asked
that the assessments of the road-bed in the tunnels be stricken
from the property valued to it.   The Court below granted
the relief asked, and the Appeal Tax Court appealed.   The
specific contention was made in the argument here as to the
tracks located in the tunnel and on the streets that the railroad
company did not own the property, that is the road-bed, and
ought not to be assessed for it, as though it was seized of it.
It had only the right to make use of the streets and the soil
beneath the streets, and to receive the tolls authorized by its
charter.   But in disposing of that contention our predecessors
said: "We do not concur in the position of the appellee that it
should only be assessed with the superstructures on the bed
of the road, irrespective of the road-bed itself, or any right or
interest therein, because the road occupies a tunnel under a
public street, or runs along the highways of the city.   The
appellee has an *easement* in the way occupied by its road, and
whether that easement be under or over the public street it is

an element of value to the road, and, as such, should be included in the valuation of the road itself.    But few of the railroad companies of the country have anything more than a mere easement in the ways occupied by their roads, and we are not aware that it has ever been held that, because the company did not own the freehold estate in the bed of the road, nothing but the mere superstructures thereon could be assessed to the company.    The rule would seem to be clearly otherwise, and that an easement enjoyed in the bed of a public street may be assessed and taxed as real estate.    *People* v. *Cassity*, 46 N. Y. 49; *Appeal of N. B. & M. R. R. Co.*, 32 Cal. 499; *Providence Gas Co.* v. *Thurber*, 2 R. I. 21." The last case cited, *Pro. Gas Co.* v. *Thurber*, 2 R. I. 21, is peculiarly apposite.    The Supreme Court of Rhode Island there said: "What then is the nature of the right which the plaintiffs, the gas company, take under their charter?    We think, when exercised, it is an easement—an incorporeal hereditament—like the right of a railroad company to build and occupy their road, or a canal company their canal, under the provisions in their charter which grant the power to take the land upon rendering compensation to the owners."    Here is a specific decision that the *right* confered by the charter—the franchise—becomes, "when exercised," an easement.

But it is not necessary to go beyond Maryland in search of adjudged cases to support the proposition that the easement possessed by a corporation in a public thoroughfare may be assessed and taxed as real estate owned by the corporation. *The Appeal Tax Court* v. *Union R. R. Co.*, *supra*, expressly so rules, as already indicated, and that case, though referred to as supporting various propositions, in eight subsequent decisions, has never been doubted, questioned or even distinguished in any particular.    *Swan* v. *Kemp*, 97 Md. 692; *Dundalk, &c., Ry. Co.* v. *Gov. Smith*, 97 Md. 181; *United Ry. Co.* v. *Balto.*, 93 Md. 633; *State* v. *N. C. Ry. Co.,* 90 Md. 473; *Smith* v. *School Com.*, 81 Md. 516; *State* v. *Falkenheim*, 73 Md. 467; *State* v. *Yewell*, 63 Md. 121; *P., W. & B. R. R. Co.* v. *Appeal Tax Court*, 50 Md. 409.    It is true that in only

one of the above eight cases was the inquiry with which we are now concerned, under discussion; but the frequent reaffirmance of the judgment in *Union R. Co.* v. *Appeal Tax Court*, as to other propositions covered by it, so thoroughly engrafts it, *in its entirety*, on the Maryland system of taxation that nothing short of a legislative enactment can now disturb or qualify it.

Can any one doubt that if the Consolidated Gas Company by purchase or condemnation had secured the right to lay its mains through private property, instead of under the streets, lanes and alleys of the city, it would have acquired an *easement*—an interest or estate in land—with which it could have been properly assessed as an owner of real estate? Surely no one would seriously contend that such a right of way through private property was a mere franchise to be considered, in fixing the company's taxable basis, as included in the value of its capital stock. In what respect, looking alone to its legal attributes, would an easement of the kind just supposed, differ from the one actually enjoyed by the company? The fact that the pipes are laid in the bed of the street without compensation having been paid for the use of the ground occupied, cannot change the nature of the estate held by the company, nor convert the thing *done*—which is an easement— into a mere right *to do* the thing—which is the franchise.

From the views thus far expressed it follows, we think, that the property or estate which the gas company has in the highways of Baltimore is an easement which may be properly assessed to the company as real estate; and hence there was no error committed by the City Court in rejecting the appellant's first prayer, nor in granting the appellee's first and second instructions.

We come next to the second inquiry, namely, did the Appeal Tax Court properly and lawfully exert the power which we hold that it possessed, to tax the easement in question? Before that question can be intelligently answered, the method actually pursued must be closely and critically examined. Now what did the Appeal Tax Court do?

First, as will be remembered, the Appeal Tax Court sent the notice of September 23rd, 1904, giving the company an opportunity "to show why an additional assessment of $6,000,000 *should not* be placed" on its real property. So, in advance of any hearing, the Appeal Tax Court apparently fixed upon a sum to be added to the company's assessment *unless* the company could show that such an increase would be wrong. The amount ef six millions of dollars was arrived at by the following process: The Appeal Tax Court acted on the theory that the entire assets and property of the company and its securities, capital stock and *obligations* on which it was able to earn a dividend and to pay interest respectively, constituted the value of its total holdings. The stock was then selling at eighty dollars a share—the par being one hundred—but in the calculation it was put at seventy dollars. There are one hundred and seven thousand shares. At seventy dollars a share the Appeal Tax Court carried out the aggregate as seven million, five hundred thousand dollars. In addition the company owed several millions of dollars represented by outstanding bonds which were valued at seven million, seven hundred thousand dollars. Then the company owed a million and a half in certificates which were put down at one million, three hundred and fifty thousand dollars. Still another item was a million of dollars of four and a half per cent general mortgage bonds, which were included at par. The aggregate of all these items footed up seventeen millions, five hundred and fifty thousand dollars, of which ten millions and fifty thousand dollars represented debts due by the company on bonds and certificates held by creditors of the company. Then from this total aggregate the Appeal Tax Court deducted the assessed value of the company's real estate, namely, four millions, three hundred thousand dollars, and there remained the sum of thirteen million, two hundred and fifty thousand dollars. The company was assessed with one hundred and fifty thousand dollars of personal property, but in deducting that personal property from the above-mentioned sum total, the Appeal Tax Court increased the valuation of the same personalty

to one million and a half from which they at once subtracted $250,000 and took the remainder—$1,250,000—from the thirteen million, two hundred and fifty thousand dollars; leaving exactly twelve millions of dollars, which sum it is insisted, represents the value of the company's franchise derived from the State, and also the increased value of its mains by reason of the enjoyment of the easements in the streets.    This result was then divided by two, and six millions of dollars were added to the assessed value of the mains and pipes to include the value of the easement enjoyed by the company in the highways.    Was that process a lawful method, *under existing statutes*, to reach a valuation of the street easements for taxation purposes?    The city contends that it is, and relies, in support of that contention, on the case of *Simpson* v. *Hopkins*, 82 Md. 478.

It must be borne in mind that there are two distinct elements which enter into the question as to whether the method pursued by the Appeal Tax Court in making the assessment now under review, was lawful; and they are, first, the right of the assessors, *under the Maryland statutes*, to measure the value of a corporation's property *for the purposes of taxation*, by adding thereto and including therein and charging against the company the *bonded indebtedness due by the corporation*; and secondly, the peculiar, and apparently arbitrary, as distinguished from juridical, ascertainment of the values apportioned amongst the component factors reckoned and comprised in the sum total of the assessment. The case of *Simpson* v. *Hopkins, supra,* does not deal with, or pass upon, either of these two elements, because neither of them was then before the Court for decision.    These are the facts—Hopkins, the collector of State and city taxes, sued Mrs. Simpson and her husband to recover the amount of taxes levied for the years 1891, 1892 and 1893 upon twelve bonds of the Consolidated Gas Company owned by Mrs. Simpson.    Three grounds of defense were relied on, namely; first, that *sec. 88 of Art. 81 of the Code*, as then in force, and under which the tax was levied, was in conflict with Art. 15, Declaration of Rights, and

unconstitutional, because it subjected to taxation in the hands of the holders, all bonds of a corporation, even though the bonds were secured by a mortgage on real property wholly within the State, whilst *sec. 4* of the same Article of the Code exempted from taxation similar mortgages and mortgage debts due by individuals; secondly, that by reason of the facts just stated, *sec. 88 of Art. 81*, was void under the Fourteenth Amendment to the Federal Constitution; and third, that by the above-named *section 88*, bonds of the description held by Mrs. Simpson were declared to be liable to assessment and taxation to the owners thereof in the same manner as like bonds secured by a mortgage on land partly in this State and partly beyond it, and that as there was no provision for the assessment of the last-named class of bonds there could be no taxation on those owned by Mrs. Simpson.   There was no question raised as to whether the gas company should have been assessed with the bonds.   Dealing with the first and second of the three defenses, and with a view of showing that there was no unreasonable discrimination made between the bonds issued by a corporation and the mortgage debt created by an individual, this Court said: "An individual's true worth for the purposes of taxation consists of his real and personal property; but in the case of a corporation its franchise, its borrowing power, its earning capacity, its real worth are not represented merely by its visible property and shares of stock. The taxable value of a corporation is its bonded indebtedness, together with its stock.   In support of this JUSTICE MILLER, in *State Tax Cases*, 92 U. S. 605, said:   'It is, therefore, obvious that when you have ascertained the current cash value of the whole funded debt and the current cash value of the entire number of shares you have, by the action of those who, above all others, can best estimate it, ascertained the true value of the road, all its capital stock and its franchises; for those are all represented by the value of its bonded debt and the shares of its capital stock.' "  We then added: "It is quite apparent, then, that this exemption of the mortgage debt of an individual and taxation of the mortgage bonds of a cor-

poration *in the hands of the respective creditors* is not an arbitrary and unreasonable discrimination between the same classes of property." Whilst we thus quoted from the *State Tax Cases, supra*, which concerned and interpreted the Illinois system of taxation that differs from ours, the citation was made, not as referring to our tax system in its application to corporations, but to show that there was no unreasonable or arbitrary discrimination involved in the *exemption* of individual mortgage debts, under *sec. 4, Art. 81, Code*, and the taxation of corporate bonds under *sec. 88* in the hands of the owners thereof; but we did not say, or imply, that under the Maryland statutes, the indebtedness of a corporation formed an assessable part of its taxable value or could be included in the assessment of its property. That question was not involved. It may not be amiss to note, in passing, the view entertained of the Illinois system by JUDGE COOLEY, though the Supreme Court reached a different conclusion. In a note to p. 136, *Cooley on Taxation*, evidently written before *The State Tax Cases* were decided by the Supreme Court, JUDGE COOLEY said: "A franchise may have a distinct value by itself irrespective of any debts that may be owing by the corporation or persons possessing it, as a farm may have irrespective of the mortgage upon it; but there is certainly some difficulty in understanding how the capital stock of a corporation can be valued without taking into account its indebtedness, or how, if the corporation owes so much that its capital stock is absolutely worth nothing and could be sold for nothing, it could have for any legal purposes a fair cash value given it by taking as the measure of its value that which renders it valueless? It may be that if, by enforcing the debt, the capital stock should become the property of the creditors, it would then have a value equal to the previous value of the debt; but this would be by the substitution of one thing for another. Before that time, certainly, the debt is no part of the capital stock." However this may be, it is perfectly apparent that *Simpson* v. *Hopkins* did not hold that the bonded indebtedness of a corporation might be added to the market value of its

stock in order to ascertain, by that process, the corporation's actual worth for the purposes of taxation, *under the then existing laws of Maryland.* The opinion does say: "The taxable value of a corporation is its bonded indebtedness together with its stock," but it does *not* say the *corporation* may be taxed on account of that indebtedness. Doubtless the General Assembly could prescribe such a rule. The question is, not *can* it validly *do so,* but *has* it *done* so?

The answer to that question must be sought in the provisions of the Code relating to assessments and taxation; and to those provisions we now turn. Naturally the first inquiry which suggests itself in this connection, is, what are the statutory requirements with regard to the valuation of bonds which constitute the indebtedness of a corporation? and to whom, by the declared will of the Legislature, are such bonds directed to be assessed for the purposes of taxation? To the corporation? To the bondholder? Or to both? Let us see. Sec. 2 of Art. 81, Code of 1904, among other things provides: "All bonds made or issued by any corporation whatsoever belonging to the residents of this State   *   *   *   shall be valued and assessed for State, county and municipal taxation *to the owners thereof* in the county or city in which such owners may respectively reside." Further on the same section also declares: "All bonds and certificates of indebtedness bearing interest, issued by any railroad or other corporation of this State secured by mortgage of property wholly within this State, belonging to residents of this State, shall be subject to valuation, assessment and taxation *to the owner or owners thereof,* in the same manner as like bonds or certificates of indebtedness bearing interest and secured by mortgage of property partly in this State and partly in some other State or States are now subject to valuation and assessment under the laws of this State." Sec. 92 of Art. 81 is in almost the same language as the above quotation, but it concludes with these words: "And it shall be the duty of the County Commissioners of the several counties and the Appeal Tax of Baltimore City to assess all such bonds or certificates of debt *to the*

*owner or owners thereof* resident in the several counties, or in the city of Baltimore, respectively." The plain and explicit terms of these sections of the Code make it the imperative duty of the County Commissioners and the Appeal Tax Court to assess to the holders thereof the bonds and certificates of indebtedness issued by the Consolidated Gas Company. The holders therefore are to be assessed with them. *Now sec. 210, Art. 81,* declares: "All bonds, certificates of indebtedness or evidence of debt in whatsoever form made or issued by any public or private corporation, owned by residents of Maryland, shall be subject to valuation and assessment *to the owners thereof* in the county or city in which such owners may respectively reside and * * upon such valuation the regular rate of taxation for State purposes shall be paid, and there shall also be paid on such valuation thirty cents (*and no more*) on each one hundred dollars for county, city and municipal taxation in such county or city of this State in which the owner may reside." This section distinctly limits the amount which may be exacted on each one hundred dollars of the assessed value of such bonds. By the prior sections the bonds are to be assessed to the *owners* thereof, and by this section the rate is restricted, outside the State tax, to thirty cents "and no more," on each one hundred dollars of their assessed value. Primarily, therefore, the creditor, who owns the bonds and not the debtor company which issued then pays the tax on them; and unless there is some explicit and unequivocal provisions of law subjecting the same bonds to an additional imposition as part of the taxable value of the assets of the indebted corporation, the Appeal Tax Court was without authority to charge the Consolidated Gas Company with ten millions and fifty thousand dollars of the company's own outstanding obligations. Is there any such provision to be found upon the statute book? A diligent search has failed to discover it and in the admirable and instructive arguments at the bar it was not even suggested that an enactment of that kind existed in Maryland. Very cogent reasons were assigned, and dwelt on with great force to sustain such a scheme of assessment. Those reasons

would doubtless have much weight with the legislative department of the State government; but we have no right or power to supply, by judicial interpretation measures of administrative detail or systems of valuation which the Legislature has not yet seen fit to adopt.   "A distinction must be noticed," said the Supreme Court, "between the construction of a State law and the power of a State." *Adams Ex. Co.* v. *Ohio State Auditor,* 1 66 U. S. 221.   We are dealing now with the construction of our existing statutes and not in anywise with the power of the State to enact in this particular a different scheme of taxation. In the case last cited the Supreme Court, after illustrating the inequality resulting from the imposition of a tax on only the tangible assets of a corporation, whilst its intangible and perhaps most valuable property was suffered to escape, observed: "Accumulated wealth will laugh at the credulity of taxing laws which reach only the one and ignore the other, while they who own tangible property, not organized into a single producing plant, will feel the injustice of a system which so misplaces the burden of taxation.  *  *  But what a mockery of substantial justice it would be for a corporation, whose property is worth to its stockholders for the purposes of income and sale $16,800,000, to be adjudged liable for taxation upon only one-fourth of that amount.   The value which property bears in the market, the amount for which its stock can be bought and sold, is the real value.   Business men do not pay cash for property in moonshine or dreamland.   They buy and pay for that which is of value in its power to produce income, or for the purposes of sale."   The *power* of the State to levy taxes on values thus computed is one thing; the *question* as to whether it has, by enactments now in force, done so, is another and a widely different thing.   With the first we have no concern, because the method of taxation, and what shall be taken as the measure of the tax, are in the discretion of the Legislature, *Cooley (Tax,* 273); as to the second, we have reached the conclusion that no such legislation has yet been adopted.   It follows then, that the method pursued by the Appeal Tax Court in this instance was without warrant of law; and that the assessment was irregular.

But there is, in addition, an equally serious objection to the
validity of the assessment, though it rests on a different found-
ation.   Whilst it is true, this Court cannot be required to sit
as a Board of Review to revise the *amount* of the valuation
placed by assessors, or other tax officials, upon property for
purposes of taxation, *Mayor, &c.*, v. *Bonaparte*, 93 Md. 159;
*State Tax Cases*, 92 U. S. 610; yet when the record shows
that a valuation had been imposed upon property in a capri-
cious or whimsical or unwarrantable way, instead of by the
exercise of judgment, then such a valuation would not be an
*assessment* at all.  "An assessment, strictly speaking, is an
official estimate of the sums which are to consitute the basis
of an apportionment of a tax between the individual subjects of
taxation within the district.   As the word is more commonly
employed, an assessment consists in the two processes of *list-
ing* the persons, property, &c., to be taxed, and of estimating
the sums which are to be the guide in an apportionment of
the tax between them."    *Cooley, Tax*, 258;  *New York* v.
*Weaver*, 100 U. S. 539; 3 *Cyc.* 1111.   Taxes by valuation
cannot be apportioned without an assessment.   "Without an
assessment they have no support, and are nullities."    *Thayer*
v. *Stearns et al.*, 1 Pick, 482.   It is shown by the evidence
that the six millions figure was fixed tentatively in the notice
sent to the company, and that it was arrived at by the method
hereinbefore indicated.   But inasmuch as the result actually
reached by the process followed by the Appeal Tax Court
produced a sum *as the value of the easement in the streets and
of the franchises*, nearly a million dollars in excess of the total
par value of the capital stock, the Appeal Tax Court pro-
ceeded at once to cut that sum down; first, by deducting an
inflated and confessedly erroneous valuation of the personal
property, and then by dividing the residuum by two. The in-
flation of the value of the personal property purely for the
purpose of augmenting the amount of the subtrahend in the
calculation detailed by the witness—an inflation having not a
pretense of fact nor a shadow of justification to rest on—nec-
essarily diminished the remainder; but as thus diminished it

was still too high to permit even the semblance of judgment in its ascertainment to be predicated of it, and it was summarily split in two. The arbitrary inflation of the value of the personal property—arbitrary because done without the suggestion of a valid reason—tainted the whole calculation. It will be remembered that the value of the personal property was fixed at one hundred and fifty thousand dollars; that this sum, without any suggestion that it was too low and without any intimation that it was erroneous, was raised to one million and a half; but when it appeared that the result obtained by deducting this last-named sum would not be represented in round numbers, two hundred and fifty thousand dollars were subtracted from the one million and a half so as to make the remainder an even twelve millions. In all this there is not an element of *judgment* as respects the *value* of the easement. Any other combination of figures might just as well have been employed, and by subtracting here and adding there, six millions of dollars—the sum named in advance in the notice—could have been as readily and precisely reached. That is not the kind of judgment which the law contemplates shall be exercised by an assessor. The *method* of valuation was wrong, and the appellant asked the Court to so rule; but by rejecting the company's fourth prayer the trial Court refused to grant that instruction. In this there was error.

There was also error in granting the appellee's sixth and eighth instructions. The sixth declares that the burden of proof was on the company to show by a preponderance of testimony that the assessment was erroneous. Presumptions are in favor of the correctness of assessments (27 *Am. & Eng. Ency. L.*, 2 ed., 728); but there must be an assessment before there can be a presumption in favor of its accuracy. In this case there was *no* assessment—hence no presumption can be invoked. The theory underlying the eighth prayer is that there had been a *valid* assessment of six millions of dollars on the easements. As that theory is unsupported, the prayer must fall. This disposes of all the questions raised in the case; and it will be seen that whilst we hold the easements in question

to be taxable, we determine that the *method* followed in valuing them, cannot obtain *under the statutes now in force.*

For the errors indicated the order sustaining the action of the Appeal Tax Court will be reversed and the alleged assessment as to the six millions of dollars will be, and hereby is, vacated.

*Order reversed with costs above and below.*

(Decided June 22nd, 1905.)