# BALTIMORE CITY COURT.

Filed December 31, 1908.

UNITED RAILWAYS AND ELECTRIC COMPANY OF BALTIMORE

VS.

THE MAYOR AND CITY COUNCIL OF BALTIMORE.

*Bernard Carter* and *Joseph C. France* for the appellant.

*City Solicitor Edgar Allan Poe* and *Assistant City Solicitor S. H. Lauchheimer* for the city.

NILES, J.—

On June 20th, 1908, the Appeal Tax Court of Baltimore City placed the following assessment on a part of the property of the United Railways, viz.: "On 233 341-1000 miles of tracks with electrical equipment and appurtenances, viaducts, bridges and structures attached to and created in, on, over, or under the ways, roads and highways in Baltimore city, $14,879,075."

From this assessment the United Railways (hereinafter called "the Company") appealed to this court.

The evidence taken at the trial showed that the foregoing amount was arrived at by the Appeal Tax Court by assessing—

233.341 miles of track (a)
$17,000 per mile....... $3,500,115.00
Viaducts, bridges and
trestles .............. 164,500.00
Easements ............. 11,214,460.00

Total ...............$14,879,075.00

I. Assessment on Track.—During the trial an agreement was reached

between the City and the Company, whereby, the track should be assessed at $12,000 per mile, and thus all questions as to this item is eliminated.

II. Assessment on Viaducts, Bridges and Trestles.—The question here is a narrow one. Code, Article 81, Section 212, provides that "No extra assessment shall be made, and no extra or special tax shall be levied or collected on any bridge or bridges over streams, or any tunnel forming any part of the roadway of any railroad or railroads, or turnpike, in this State, it being the meaning and intent of this section that any bridge over streams, or any tunnel forming a portion of the roadway of any of said railroads or turnpikes, shall be valued and assessed at the same rate that any other equal portion of such railroad or turnpike is valued."

The structures, upon which the assessment in question is made, are confessedly neither "bridges over streams" nor "tunnels," but comprise certain viaducts over ravines, (of comparatively small value,) and the elevated tracks on North street.

It must, of course, be admitted that considerable license must be taken with the English language in order to call such a structure as the elevated tracks on North street, either a "bridge over a stream" or a "tunnel," but the argument made for the company is that the language of the section above quoted, clearly establishes as a principle of the tax laws of Maryland, that any railroad construction, whether steam railroad or street railroad, that carries a mile of track is to be assessed at the same rate as any other mile of the track of the same railroad.

It seems to the court that such a policy has much to be said in its favor; and, had the Legislature said this, the court would have felt no hesitation in acting accordingly.

But this court feels that it would not be warranted in holding that such is the meaning of the words used by the Legislature. The Legislature has said that "bridges over streams" and "tunnels" shall be exempt. It has not said that elevated tracks over a street shall be exempt, and courts can only give effect to exemption, either partial or total, from assessment and taxation, when such exemption is plainly expressed by the act of the Legislature. The judiciary cannot extend an ex-emption granted by the legislature to other property than that exempted, because it is possible, or probable, or even certain, that the same reason which induced the granting of the exemption given, should have induced the granting of the exemption claimed. There being no dispute as to the amount of the assessment of this item, if assessable at all, it will be included in the assessment.

III. Assessment on Easements.— This, of course, is the main point of the case. The company's claim is two-fold.

(A) That the Appeal Tax Court had no power to assess this easement at all.

(B) That the assessment actually made is illegal and excessive.

(A) The company claims that it already pays certain public charges and a "park tax" of 9 per cent. upon its gross receipts, "which said payments required to be made, and made in cash every year, are, and were intended by the State of Maryland and the Mayor and City Council of Baltimore to be (in connection with the other obligations imposed by the laws and ordinances relating to the said company), payments in full for, and as full value of, all uses made from time to time of the said public highways in the con-struction, maintenance and operation of its said railways, and in full payment and discharge of all taxes upon the easement enjoyed by the company in the said streets and highways."

It, therefore, contends that "by add-ing an additional burden of the same nature," the tax now sought to be im-posed would impair "the obligation of the contract between the Mayor and City Council of Baltimore and the peti-tioner under which the petitioner laid, and operates over its tracks."

In other words, the company's claim is that, when this tax was im-posed, it was offered by the City and accepted by the company's predecessors as in substitution for, and commuta-tion of, all taxes upon easements in the streets to which the company and its predecessors might otherwise be sub-ject; and that such offer and accept-ance constitutes a contract which, al-though liable to be changed (under the Constitutions of 1851 and 1867), by the Act of Legislature, remains binding upon both parties until so changed.

Since the case of Consolidated Gas Co. vs. Mayor and City Council of Baltimore, 101 Md. 541, it cannot be doubted but that the city has the power generally to assess the easements possessed by public service corporations in the streets of the City of Baltimore, and, in this particular case, no question is made of its right to lay the tax, unless the "Park Tax Legislation" destroys such right.

To this court it is plain that no such effect can be attributed to the park tax. This court holds:

First. That the park tax is a franchise tax, and the easement tax sought to be imposed here is a property tax.

The taxes are not of the same kind, and are levied upon different property, and, therefore, one is not, and cannot be, in substitution for, or in commutation of the other, unless made so by a binding contract expressed in plain words.

Second. No such binding contract between the company and the city has been expressed in plain words; and (although not necessary to the decision in this case) there is nothing to support the argument that such a contract exists by implication, except the fact that, for many years, the city has not actually assessed, or taxed, the easement.

First. This is by no means the first time that this 9 per cent. park tax has been before the courts, and the Court of Appeals, as this court reads its decisions, has, in express terms, declared it to be a franchise tax.

In Union Pass. Rwy. vs. Baltimore, 71 Md. 413, the Court of Appeals speak of it as "the nine per cent. tax which has been imposed for the privilege accorded by the city to the appellant of using its streets for railway purposes," and again it speaks of the appellant company as "having accepted their privileges on the condition of paying this tax upon the gross receipts."

In The Park Tax Case, 84 Md. 16, the Court of Appeals, speaking through Chief Judge McSherry, says: "Since the decision by this court of the case of Balto. Union P. Rwy. Co. vs. M. & C. C. of Baltimore, 71 Md. 405, there can be no question that the tax thus imposed was laid and collected in consideration of the privileges or franchises granted by the city to the several street railway companies to lay their tracks and to run their cars upon the public thoroughfares of the city" * * * "The history of the legislation relating to this subject would, apart altogether from the explicit language used in 71 Md., supra, be sufficient to demonstrate, we think, that the tax was a franchise tax, exacted in exchange for the privilege accorded those several companies to lay their rails and run their cars upon city streets." * * *

"Clearly this language indicates if it does not expressly declare that the tax was the equivalent for the grant." * * *

"If then, no right was conferred by the City (on the particular turnpikes then in question),—and confessedly there was not—for the tracks were laid long before the City's limits embraced any part of the territory through which the appellee's railroad runs, the City gave nothing to the appellee in exchange for which it could lawfully exact the franchise tax."

Finally in Baltimore vs. United Railways, 68 Atl. 557, Chief Judge Boyd, delivering the opinion of the Court of Appeals, speak again of this "9 per centum tax which has been imposed for the privilege accorded by the city to the appellant of using its streets for railway purposes."

Judge Boyd quotes from the case in 71 Md. and 84 Md., the language already given in this opinion, including the words wherein the tax was expressly called "a franchise tax," and arguendo he alludes to it as a franchise tax several times, as follows, viz: "It was not intended to hold that, because the city did not originally grant the franchise, the legislature had not empowered it to impose a franchise tax for the use of what are now its streets, although they originally belonged to the county.

There are many cases in the State, as well as elsewhere, in which the right to impose a franchise tax has been sustained, although when the franchise was granted it was not imposed, or the right to do so specifically reserved. The City of Baltimore has no power to grant a franchise to use its streets, unless such power has been conferred upon it by the legislature, and the legislature could grant a railway company the franchise to use the streets of the city without its consent:

If, therefore, the Legislature did, directly or through Baltimore County, grant a franchise to a company to lay its tracks upon the public streets of the county, and then subsequently authorize the extension of the City limits, so as to include such streets, it could undoubtedly authorize the City to impose a franchise tax for the privilege of using those streets.

As against this mass of authority the company segregates one sentence from Judge Boyd's same opinion, as follows, viz: "The real consideration for the tax is the use of the streets, and not merely the right to use them which may never be exercised."

The argument is that, since the difference between a "franchise" and an "easement," was pointed out by the master hand of Chief Justice McSherry, in Consolidated Gas Co. vs. Balto., 101 Md. 547, everyone must concede that "the use of the streets" is an easement, and "the right to use them" is a franchise, and, therefore, if the "consideration" of this park tax is an easement, and not a franchise, the tax is an "easement tax," and not a "franchise tax."

But to this Court, taking these words in connection with the whole opinion wherein the tax is, as before shown, repeatedly called a franchise tax, such a construction of the words seems strained, and absolutely contradictory to all the rest of the opinion.

In the opinion of this Court the language last quoted plainly refers to the money paid in satisfaction of this franchise tax. Inasmuch as when "the privilege" was "accorded by the city to the appellant of using its streets for railway purposes," the payment imposed therefor was not to be made at once, but only after use was made of the franchise, an easement acquired, the road was put into operation and passengers carried, and then the amount of the payment was to be determined by the number of such passengers, the 'real consideration," or the effective cause, of any park tax becoming due, is the "use of the streets;" for, until there was such use, there was no tax collectible upon the franchise.

It does not seem necessary here to repeat the well known history of the tax, or to show how impossible it would be—in the light of that history —to hold the tax to be anything but a "franchise tax." It is enough for us

now that the Court of Appeals has so defined it in express terms.

The Park Tax then being a "Franchise Tax" what is the tax now sought to be imposed?

It seems to this Court equally clear that this last mentioned tax is a property tax of the nature of a tax on real estate.

The company (or its possessors), having received its franchise, laid its tracks on the streets of the city by virtue thereof, and commenced the running of its cars. It then possessed an easement in the streets, which easement was rendered of great value by the franchise referred to, and the Court of Appeals has said that "the estate which the * * * company has in the highways of Baltimore is an easement which may be properly assessed to the company as real estate." Consol. Gas Co. vs. Baltimore City, 101 Md., 550; and that it is "a self-evident proposition that the use to which a franchise permits an easement to be put, is an essential element to be considered in placing a valuation on that easement for the purposes of taxation." Consol. Gas Co. vs. Balto. City, 101 Md., 548, quoted in Consol. Gas Co. vs. Balto. City, 105 Md., 57.

This Court, therefore, holds that a franchise tax, exacted from a street railway for the privilege accorded it to lay its rails and run its cars on city streets, may be a lump sum paid in advance before a single rail is laid or car is run, or it may be, as in this case, deferred and made to depend upon the actual running of the cars, so that the payments, when made, may be said to be "in consideration of the use of the streets;" but, in either case, it is a tax upon, or an equivalent for the franchise, and is a tax of a different kind and upon altogether different property from the "real estate tax" which may be levied upon the easement—the property or estate possessed by the company in the streets—even though the main profitableness of this easement is directly due to the use which the franchise permits the company to make of it.

It is not, therefore, "adding an additional burden of the same nature" when a company, which possesses franchises granted subject to a tax or burden, is also taxed upon its real estate, or upon that which may be

"taxed as real estate," viz: its easements.

Second. But it is argued on behalf of the company that, whether the 9 per cent. tax be a "franchise tax" or a "property tax," or, however it may be called, it is in commutation of, and substitution for all other taxes upon its easements in the streets of Baltimore.

It is not necessary here to examine the point, made with such earnestness and ability that, even although the 15th Article of the Declaration of Rights establishes equality of taxation as a constitutional principle, the legislature can, nevertheless, under the principle acted on in the case of Faust vs. The Building Asso., 84 Md., 186, make a valid "legislative assessment," whereby the property of one corporation shall be valued by a rule which is applicable to no other person within the limits of the State. It is enough for this case that there is no sufficient evidence anywhere of any such "commutation" or "substitution."

When this "Commutation" is effected, it must be expressed in plain language, as in Stearns vs. Minnesota, 179 U. S., 223, where the wording of the act was that the railroad company, which was a party to that case, should "pay into the Treasury of the State three per cent. on the gross earnings of said railroad, which sum shall be in lieu and in full of all taxation and assessments upon the said railroad, its appurtenances and appendages and all other property of the said company, real, personal and mixed."

So, in McHenry vs. Alford, 168 U. S., 651, 661, the wording was "in lieu of any and all other taxes upon any railroads," &c., and "in full of any and all other taxation and assessments whatever, upon the property aforesaid.

So in the Maryland case of State vs. N. C. R., 90 Md., 447, 450, the Act in question provided that "all the franchises and property of every description and gross receipts of said Northern Central Railway Company within the State of Maryland shall be subject to taxation for State purposes to the extent of an annual tax of half of one per centum upon the gross receipts from its railroad and branches lying within the State of Maryland, and from all other sources within this State, and said franchises, property

and gross receipts shall not be subject to any other tax under the laws of the State of Maryland."

But in this case the effort is to have the Court construe a "franchise tax" not only to be in full of all payment for, and taxes upon the company's franchises, but also to include, by an operation of substitution and commutation, a part of the company's real estate taxes, and this in spite of the fact that in none of the statutes or ordinances is there a word or a syllable intimating that this franchise tax is imposed with any reference to anything else than the privilege accorded, viz: the franchise itself.

In the argument, all this consequent was said to follow from the mere fact, that the payments on account of the franchise tax were to be made each quarter during the existence of the franchise, and were to vary according to the business done by the company.

To this Court it does not seem possible that exemption from taxes on all its other property or on any of its other property can be implied, in reference to a company possessing franchises, from the mere fact that the tax or compensation paid on, or for, its franchises is to be paid in any particular manner, or to be computed in any particular method.

"The taxing power is never presumed to be surrendered, and, therefore, every assertion that it has been relinquished must, to be efficatious, be distinctly supported by clear and unambiguous legislative enactment. To doubt is to deny an exemption."

Sindall vs. Baltimore City, 93 Md., 526, 530.

This Court cannot adopt the distinction so ingeniously drawn by the junior counsel for the petitioner between this case and the case of Metropolitan St. Rwy. Co. vs. New York, 199 U. S., 1, and it seems to this Court that if that case be regarded as authority it is conclusive of the point now being considered.

By the "Ford law" a franchise tax was placed upon street car companies in New York, which companies already possessed (see p. 38), franchises subject to "various conditions and stipulations to be observed by them, 'such as payment of a license fee, of a gross sum down, of a specific sum each year,

or a certain percentage of receipts as a consideration,' or 'in full satisfaction for the use of the streets'."

Under these facts the Supreme Court of the United States held the easement tax to be valid, saying (p. 37). "As consideration for the grant the grantees were to pay something, and such payment is nowhere said to be in lieu of, or as an equivalent or substitute for taxes. All that can be extracted from the language used was a grant of privileges and a payment therefor. Other words must be written into the contract before there can be found any relinquishment of the power of taxation."

(b) Is the assessment actually made illegal or excessive?

The Appeal Tax Court construed the Court of Appeals to hold, in the Gas Company case, 101 Md., 541, and 105 Md., 43, that an assessment of an easement was illegal which was based either upon the capitalization of the company as shown by the market value of its bonded indebtedness and dividend-paying stock: or by its total net receipts, less in either case the assessment of all other property upon which taxes were paid, and that. in order to arrive at a proper assessment, the price which the company paid to the city under its charter for similar franchises might well afford a basis upon which a legal computation could be made.

They, therefore, took into consideration the price which was actually given (see Ordinance 102 of 1905-1906) by this very company for a franchise on German and Hanover streets, which franchise was only for a term ending in 1919, which was burdened with the park tax, and various special provisions requiring expenditures, and which recited in its preamble facts which seemed to indicate that it was not desired by the company with a view to profit, but only for the sake of serving the public convenience.

For this franchise the company was willing to give, and did in fact give $18,000, in cash or its equivalent, and the tracks were laid and the cars were run over them.

The Appeal Tax Court considered that the easement was worth at least the amount paid for the franchise. The amount was found to be $6.57 per running foot of single track, and they assessed all the other tracks of the

company, the franchise upon which expires in 1919, and which is subject to the park tax at the same rate.

That part of the company's tracks which was subject to the park tax, but as to which the company possessed an unlimited franchise, they assessed at 1½ times the German street rate. That part of its tracks as to which the company had an unlimited franchise, and which was not subject to the park tax, because of running upon private rights of way and not upon streets, was assessed at twice this amount.

The questions now to be considered are two. First, is this method of making the assessment illegal? Second, is the assessment so made excessive?

The first question this Court answers in the negative if it be applied to the general method of assessment.

By that is meant that this Court holds that an assessment of the easement possessed by the company in the streets of Baltimore may be properly made by considering the amounts which the company has been willing to pay for franchises giving it the right to use certain streets for its purposes, and such is the general method adopted by this Court as herein afterwards set out.

For this particular assessment this Court thinks that all the franchises mentioned in the evidence should be taken into consideration in the way hereinafter set forth, but the Court is not willing to commit itself to the proposition that there is any detail of the plan followed which is essential. The only thing decided is that an assessment upon the company's easement may be legally made when it is based on the best judgment of the assessing officials as to its salable value, guided by the prices paid for franchises covering similar easements.

As to the second question there is much to be said in favor of the amount obtained by the Appeal Tax Court.

When one compares the unlimited franchises in streets like Baltimore, Fayette, Gay and Charles, or Madison and Linden avenues, with the franchises for 15 years on German street, which the company did not want, which was not expected to be profitable, and the working under which has in fact been at a loss, it may well be argued

that there are at least many parts of the company's track-easement more valuable than that on German street. Then the practical agreement of the Appeal Tax Court's figures with the price paid by the company for the 25th street franchise, and with the amount at which General Hood appraised the York Road easement might well confirm the Appeal Tax Court in their assessment.

At the same time the strong preponderance of the argument in this Court's mind is against the acceptance of the Appeal Tax Court's figures.

It is impossible for it to agree with the contention of the company that its easements are of no value beyond the burden of the park tax, but this Court cannot help feeling that where a particular kind of tax, even though legal, has not in fact been imposed for many years, during which much money may have been actually invested in the construction and improvement of the plant of a great public service corporation, and during which much money was certainly obtained from investors, and many securities "floated," upon the basis of comparison of earnings with the then known expenses in which expenses this tax never figured, there may be great hardship in compelling the company to pay a greater than a fair tax. Less injurious consequences will follow when this new tax is imposed, if, at the beginning, the assessment is too small rather than too large.

Seven ordinances have been offered in evidence where franchises have been granted. They are, as follows, viz:

German St. Franchise, 2,700 feet, for which $5.69 per foot was paid.

Boulevard Franchise, 15,840 feet, for which 96 cents per foot was paid.

Huntingdon Ave. Franchise, 900 feet, for which $6.66 per foot was paid.

Federal St. Franchise, 15,840 feet, for which 10 7-10 cents per foot was paid.

Garrison Ave. Franchise, 10,560 feet, for which 4 3-10 cents per foot was paid.

Gorsuch Ave. Franchise, 14,256 feet, for which 33 cents per foot was paid.

Woodberry Franchise, 21,120 feet, for which 14 cents per foot was paid.

It seems to this Court that, upon the whole, the fairest way of arriving at a valuation of all the company's easements in the whole city is to regard these franchises as samples, taken, so far as assessment purposes are concerned, at random from the whole mass. Then, by taking an average of all these "samples," to apply it to the whole.

At the outset, it is necessary to determine whether the average of these "samples" shall be taken by simply adding up the price per running foot paid in each instance by the company and dividing by seven, or by adding up the total number of feet of track mentioned in these ordinances and dividing that into the total price paid.

It seems to this Court that the former method is the fairer one.

In the testimony (page 259) it was developed that about 50 miles of the company's trackage ran "through what might be called rural country," and this trackage, although perhaps valuable for "feeders," and in other ways, is not at this time, in and of itself, operated at a profit. There is, therefore, an immediately greater value attributable to the 163 miles which does not run through "rural country" than to the 50 miles which passes through such territory. Yet, out of the 81,216 feet embraced in these seven ordinances, the Federal street trackage, the Garrison avenue trackage, the Gorsuch avenue trackage and the Woodberry trackage, embracing a total of 61,776 feet, runs through this "rural country."

The 15,840 feet embraced in the Boulevard Ordinance, should we accept the testimony given by Mr. Cross on behalf of the company, may also be considered as within this class, leaving only 3,600 feet out of a total of 81,216 feet to be properly classified as belonging to the same class as the 183 miles running through built-up territory, embraced in the company, a total trackage of 233 miles.

To adopt, therefore, the method advanced by the petitioner would be to take less than five per cent. of the "sample" trackage from the 183 miles of built up territory, although that 183 miles comprises almost 80 per cent. of the entire road.

It is also in the mind of the Court that even though it should adopt the average price as based upon one-seventh of the total price per foot mentioned in the seven ordinances, there is no sample included in those seven which at all approximates in value the worth of such easements as are possessed by the company on such streets as Baltimore and Fayette, and that five out of seven samples come from

what may be regarded as "rural territory."

It is also recognized by the Court that none of these franchises are as valuable either as the franchises over the turnpikes and private ways, which are not burdened with the park tax, or as those franchises which have an unlimited time to run. In all these respects, the method pursued by the Court gives advantage to the company.

But, on the other hand, the Court was much impressed with the argument made, particularly by the distinguished senior counsel for the company—taking the case of Ohio vs. Adams Express Co., 166 U. S., 185, for his text—to the effect that each portion of the road derives its value in part from a successful operation of every other portion of the road, and the relation of the small portion to the whole; from the "good will" and the administrative machine, which is an attribute of the business as a "going entity," the value of which is only taxable as reflected in the value of the stock. This, it is claimed, puts the company, when it agrees to pay a certain sum for any one short piece of track, in the position of a large operator who, in order to erect some large improvement, must purchase a whole square of land, and is very often obliged to pay the holder of a small plot, which is needed, in order to carry out the whole improvement, an extravagant price. It is certainly true that, in such a case as is put in illustration, the price, which might be extorted from the large real estate operator by such small holder, would be excessive if taken as the assessment of such small lot. This court is of the opinion that the same rule applies to a certain extent in the case of this company in regard to the easements now in question and it is by setting off this consideration against the other facts which, as has been before said, would otherwise make the basis of valuation adopted too

favorable for the company, that the court feels justified in asking the computation as above stated.

Our Court of Appeals said in State vs. R. R. Company, 45 Md. 384, that "perfect equality in the assessment and apportionment of taxes is unattainable," and perfect accuracy is equally unattainable. In the language of the United States Supreme Court (199 U. S., quoted in 105 Md. 62) : "All that can be required is that the assessing board exercise an honest judgment based upon the information it possesses or is able to acquire."

When, therefore, a case is presented where valuation can only be based on an estimate, the best rule would seem to this court·to be the simplest rule which can possibly be obtained by what may be called a "cancelling out" of opposing factors; and in the exercise of its best judgment, this court is brought to the conclusion that, setting off one consideration against another, an assessment of the whole track of the company obtained by applying to it the average rate on the seven pieces of track provided for the ordinances mentioned, will produce a legal and a fair and just valuation.

It seems to the court that it is, at least, sufficiently conservative, and is—as it was meant to be—as favorable to the company as the court's ideas of law and fact will justify.

The average rate obtained by adding up the rate in each of the seven ordinances and dividing by seven is 2.12 per foot. 233.341-1000 miles is 1,232,040.48 feet. This at $2.12 per foot gives a total assessment of $2,611,925.81.

The assessment on the easements possessed by the company will, therefore, be reduced from ...................$11,214,460 00
to ............................ 2,611,925 81
The assessment will then stand
 233.341-1000 miles of track (a)
 $12.000 per miles, as per
 agreement ...................$2,800,092 00
Viaducts, bridges and trestles.. 164,500 00
Easements ..................... 2,611,925 81

 Total .....................$5,576,517 81