MAYOR AND CITY COUNCIL OF BALTIMORE *v.*
IZAK BLIBAUM ET AL.

[No. 152, September Term, 1976.]

*Decided July 14, 1977.*

The cause was argued before MURPHY, C. J., and SINGLEY,
SMITH, DIGGES, LEVINE, ELDRIDGE and ORTH, JJ.

*Ambrose T. Hartman, Deputy City Solicitor,* with whom were *Benjamin L. Brown, City Solicitor,* and *J. Warren Eberhardt, Assistant City Solicitor,* on the brief, for appellant.

*V. Timothy Bambrick,* with whom were *Edgar H. Gans* and *Niles, Barton & Wilmer, Stanley B. Rohd* and *Whiteford, Taylor, Preston, Trimble & Johnston* on the brief, for appellees.

LEVINE, J., delivered the opinion of the Court.

This case presents the question whether the Mayor and City Council of Baltimore (the City), appellant herein, is subject to subrogation claims brought under Maryland Code (1957, 1975 Repl. Vol.) Art. 82, §§ 1-4 (the "Riot Statute") by casualty insurers of persons whose property was damaged in the civil disorders occurring in Baltimore City in April, 1968. The Superior Court of Baltimore City (Greenfeld, J.) held that such actions could be maintained. The City appealed the decision to the Court of Special Appeals, but we granted certiorari before the case was heard by that court. We affirm.

In January 1968, appellees Continental Insurance Company (referred to as "Continental" or "the insurer") and Travelers Indemnity Company (referred to as "Travelers" or "the insurer") each issued three-year standard fire insurance policies to Izak and Lee Blibaum (referred to as "Blibaum" or "the insured"). These policies insured Blibaum against loss to personal property and inventory at his place of business "caused directly or indirectly by riot, civil commotions, [or] insurrection . . . ." As a consequence of the damage which Blibaum sustained in the April disorders, Continental and Travelers each paid the insured the sum of $2,244.66. Pursuant to a provision in each policy authorizing the insurer to "require from the insured an assignment of all rights of recovery against any party for loss to the extent that payment therefor is made by [the insurer]" and to Blibaum's execution of separate loan receipts,

the two insurers demanded payment of the City for the sums which they had paid Blibaum. Numerous other insurers and property owners made similar demands against the City, which responded with the declaratory judgment action leading to this appeal.

The trial judge, at the conclusion of his carefully considered opinion, declared that the insurers "are entitled to be subrogated for the insured damages sustained by [their] insureds, provided it is proven in the pending damage suit that the City was negligent under Article 82 of the Annotated Code of Maryland." The appeal by the City followed.

Article 82,[1] which is the codification of Chapter 137, Acts of 1835, as later amended by Chapter 282, Acts of 1867, provides that if certain designated kinds of real property are injured or destroyed or "any articles of personal property" are injured, destroyed, or taken away by "any riotous or tumultuous assemblage of people," the "sufferer or sufferers" may recover the full amount of their damages in an action at law against the "county, town or city within whose jurisdiction such riot or tumult occurred."

---

1. Article 82 provides as follows:

    1. "If in any county or incorporated town or city of this State, any church, chapel or convent, any dwelling house, any house used or designed by any person or any body corporate as a place for the transaction of business or deposit of property, any ship, shipyard or lumberyard, any barn, stable or other outhouse, or any articles of personal property shall be injured or destroyed, or if any property therein shall be taken away, injured or destroyed by any riotous or tumultuous assemblage of people, the full amount of the damage so done shall be recoverable by the sufferer or sufferers by suit at law against that county, town or city within whose jurisdiction such riot or tumult occurred."

    2. "No such liability shall be incurred by any county, incorporated town or city, unless the authorities thereof shall have had good reason to believe that such riot or tumultuous assemblage was about to take place, or having taken place, shall have had notice of the same in time to prevent said injury or destruction, either by its own police or with the aid of the citizens of such county, town or city, it being the intention of this article that no such liability shall devolve on such county, town or city, unless the authorities having notice have also the ability of themselves, or with their own citizens, to prevent said injury; and all causes of action under § 1 shall be prosecuted within the period of three years from the time of accrual of the same."

The legislative history of Article 82 is illuminating. The Report of and Testimony Taken Before the Joint Committee of the Senate and House of Delegates (1836) at 6, includes this revealing statement by its chairman, William D. Merrick:

"... [I]n the judgment of your committee, it is expedient at once to set an example by, and carry out in perspective [sic] legislation, provisions that will connect the interest of any tax-payer at least with the support of the laws, and demonstrate to the disorderly and malicious, that those whom they would make victims of lawless wrath, are under the broad shield of indemnity, from which their blows may glance with injury to themselves, or their friends."

Somewhat more recently in *City of Baltimore v. Silver*, 263 Md. 439, 445 n. 4, 283 A. 2d 788 (1971), *appeal dismissed*, 409 U. S. 810 (1972), we dealt with the riot statute, also in regard to the April 1968 disorders, where we noted, as described in Brewer, *"The Democratization of Maryland, 1800-1837,"* in *The Old Line State* 62 (Radoff ed. 1971), the events which immediately preceded enactment of Chapter 137. Passage of the statute was precipitated by the Baltimore "Bank Riots" of August 1835, resulting from the national bank disaster of that era, which swept the Bank of Maryland into receivership.[2]

---

3. "In no case shall indemnity be recovered when it shall be satisfactorily proved that the civil authorities and citizens of said county, town or city, when called on by the civil authorities thereof, have used all reasonable diligence and all the powers intrusted to them for the prevention or suppression of such riotous or unlawful assemblages."

4. "In any suit instituted under this article, the plaintiff may declare generally and give the special matter in evidence."

2. The vivid description of the mob action which led directly to the enactment of Chapter 137 appears in Brewer, *"The Democratization of Maryland, 1800-1837,"* in The Old Line State 62 (Radoff ed. 1971):

"From August 6th through August 10th, mobs assaulted the homes of the directors, and of Reverdy Johnson, the counsel; and law and order collapsed as Baltimore became again 'Mobtown.' Mayor Jessee Hunt resigned, and General Anthony Miltenberger,

Maryland is one of some 15 states with statutes which presently fasten liability on local governmental units for losses resulting from mob violence. In recent years, four other states have repealed such statutes. We traced the origin of the riot statute in *City of Baltimore v. Silver*, 263 Md. at 445-46, where we quoted this statement from *City of Chicago v. Sturges*, 222 U. S. 313, 323, 32 S. Ct. 92, 56 L. Ed. 215 (1911):

> "The policy of imposing liability upon a civil subdivision of government exercising delegated police power is familiar to every student of the common law. We find it recognized in the beginning of the police system of Anglo-Saxon people. Thus, 'The Hundred,' a very early form of civil subdivision, was held answerable for robberies committed within the division. By a series of statutes, beginning possibly in 1285, in the statutes of Winchester, 13 Edw. I, c. 1, coming on down to the 27th Elizabeth, c. 13, the Riot Act of George I (1 Geo. I, St. 2) and Act of 8 George II, c. 16, we may find a continuous recognition of the principle that a civil subdivision entrusted with the duty of protecting property in its midst and with police power to discharge the function, may be made answerable not only for negligence affirmatively shown, but absolutely as not having afforded a protection adequate to the obligation. . . ."

Several reasons, which today seem largely theoretical, are advanced for the emergence of the riot statute in this country during the 19th century. Originally, the statute was conceived on the assumption, as was the purpose in

president of the first Branch of the City Council, asked the direct aid of eighty-three year old General Sam Smith. With the decision which characterized his every action, the old hero of North Point mobilized an informal militia of responsible citizens and began the systematic patrolling of the streets. Thus ended the Bank Riots, but judicially the prosecution and punishment of the offenders extended into the next year, and the property damaged and ruined was compensated for by an act of the legislature of August 6, 1836." (Footnote omitted).

Maryland, that it would deter rioters by spreading the tax burden upon the entire community, not only upon the random victim, but also upon those who might be tempted to participate. In this manner, the enthusiasm of would-be rioters might be dampened. *City of Chicago v. Sturges*, 222 U. S. at 323-24; Note, *Criminal Victim Compensation in Maryland*, 30 Md. L. Rev. 266, 275 (1970). It was also thought that the statutes would provide an incentive to local officials to prevent disturbances or to quell them if already underway. Note, *Municipal Liability for Riot Damage*, 81 Harv. L. Rev. 653, 654 (1968). The riot statutes were also aimed at stimulating the indifferent and the law-abiding citizen to prevent the damage and thus avoid the tax burden which they would be required to share with the lawless. Also, "[i]n that it directly operates on and affects public opinion, [the riot statute] tends strongly to the upholding of the empire of the law." *City of Chicago v. Sturges*, 222 U. S. at 324.

The City argues initially that Article 82, being in derogation of the common law, must be strictly construed to include within its protective ambit only those who are expressly mentioned in the statute, "the sufferer or sufferers." Thus, it is maintained, statutory coverage is extended only to owners of property. The City contends: "Had it been intended by the General Assembly that insurance carriers be recompensed for payments on risks for which they receive premiums, thereby passing the burden onto the taxpayers, including the very persons who paid the premiums, it would have expressly so stated in the Act."

To support its argument that the statute should be so strictly construed as to protect only the owners of property, the City relies primarily upon *United States Casualty Co. v. State Highway Dept.*, 155 S. C. 77, 151 S. E. 887, 890 (1930), in which an insurance company, as subrogee, sued a state highway department for damages to its insured's automobile caused by a defectively maintained highway. A demurrer to the action was sustained on several grounds, but we are concerned with only one: That the statute, which conferred the right to sue the state agency upon any "person . . . who

may suffer ... damage to his ... property" precluded an action by the subrogated insurance company because " 'consent of the state to be sued must be given in *express terms or at least in terms so clear and unambiguous as necessarily to imply consent.*' " *Id.* (emphasis in original). The implication of this statement was, in essence, that the suit could not be maintained absent express statutory authority for subrogation. Thus, the court stated:

> " '... [S]tatutes authorizing suits against a state, being in derogation of its sovereignty, *should be construed strictly,* although not so strictly as to exclude a case clearly coming within their terms, for the construction should be such as to carry out the legislative intent.' ..." *Id.* (emphasis in original, citation omitted).

*Accord, American Mut. Liability Ins. Co. v. State Highway Com'n,* 146 Kan. 239, 69 P. 2d 1091, 1093-96 (1937) (statute granted right to sue to "[a]ny person who shall ... sustain damage"); *cf. Sun Indemnity Co. v. Board of Education,* 264 App. Div. 73, 34 N.Y.S.2d 475, 476, *appeal denied,* 35 N.Y.S.2d 732 (1942) (statute, conferring upon teacher right to indemnity from board of education for claims against him, could not be "extended by implication" to protect his subrogated liability carrier). *But cf. Jeff Hunt Mach. Co. v. South Carolina State H. Dept.,* 217 S. C. 423, 60 S.E.2d 859 (1950) (although insured had been paid by his insurer, he could nevertheless recover from state highway department; court limited *United States Casualty* holding to action brought only by subrogated insurer).

We do not agree that Article 82 must be so narrowly construed as to limit recovery to the owner himself and, therefore, to bar recovery to the insurer subrogated to his claim. We think the sounder view was expressed by the North Carolina Supreme Court in *Lyon & Sons v. N. C. State Board of Education,* 238 N. C. 24, 76 S.E.2d 553, 559 (1953), in which the court held that a subrogation claim could be maintained against the Board of Education under a state tort claim act, despite the absence of any provision in

the statute purporting to authorize such relief. In so holding, the court rejected the strict construction argument advanced there as being incompatible with "the current trend of legislative policy and of judicial thought." 76 S.E.2d at 555. Instead, the court, expressly rejecting *United States Casualty Co. v. State Highway Dept.*, 151 S. E. 887, adopted this view:

"When a State consents to be sued or waives its governmental immunity, it occupies the same position as any other litigant, and a plaintiff has the same right that he would have to sue an ordinary person. The State in such circumstances is not entitled to special privileges. . . ." 76 S.E.2d at 556 (citations omitted).

The North Carolina court reasoned that had the state "desired to exclude the right of subrogation, it would have written such exemption into the Act." *Id.* at 559. The court further observed that the same view had been taken by the Supreme Court of the United States in *United States v. Aetna Surety Co.*, 338 U. S. 366, 383, 70 S. Ct. 207, 94 L. Ed. 171 (1949), in which the Court refused to apply a strict construction to the Federal Tort Claims Act in sanctioning recovery by subrogated insurers.

It is no more apparent to us than it was to the North Carolina court "why the prudent foresight of the plaintiff in protecting its property by insurance should result in a benefit to the State, or a detriment to the insurance carrier." *Lyon & Sons v. N.C. State Board of Education*, 76 S.E.2d at 559. We think an appropriate response to the strict construction argument was made by Judge Cardozo for the New York Court of Appeals in *Anderson v. John L. Hayes Const. Co.*, 243 N. Y. 140, 153 N. E. 28, 29-30 (1926):

". . . The exemption of the sovereign from suit involves hardship enough where consent has been withheld. We are not to add to its rigor by refinement of construction, where consent has been announced."

660

We join the United States Supreme Court and the North Carolina Supreme Court, both of whom quoted that statement with approval, in adopting the same view here.

The City also contends that public policy and equity principles militate against application of the doctrine of subrogation to cases arising under Article 82. It is a fundamental proposition, of course, that subrogation is founded on principles of equity, *Gov't Employees Ins. v. Taylor*, 270 Md. 11, 20, 310 A. 2d 49 (1973); *Schnader, Inc. v. Cole Build. Co.*, 236 Md. 17, 21-22, 202 A. 2d 326 (1964); Mullen, *The Equitable Doctrine of Subrogation*, 3 Md. L. Rev. 201 (1939), although the doctrine is also cognizable in actions at law, *Gov't Employees Ins. v. Taylor; Schnader, Inc. v. Cole Build. Co.*, both *supra*. The City relies upon this public policy-equity principle rationale for its argument that as opposed to the subrogated insurance carrier, rather than the damaged property owner himself, the municipality should not bear the financial burden caused by riot or disorder. Thus, it reasons that to allow recovery by the insurer under principles of subrogation "would require members of the community at large who did not participate in the disorder, including those who paid premiums to the insurance carrier, to bear the risk for which the carriers have been paid premiums."

Several cases heavily relied upon by the City lend only superficial support to its public policy-equity principle argument. The first is *William Burford & Co. v. Glasgow Water Co.*, 223 Ky. 54, 2 S.W.2d 1027 (1928). There, a group of insurers, proceeding by subrogation, sued a water company for fire damages sustained to quantities of tobacco, which they had insured, on the theory that the water company had caused the damage by failing to comply with its franchise contract to supply water. The Kentucky court held that recovery by subrogation did not lie, since liability of the water company rested on contract, rather than on fault. Had the water company been guilty of tort, then it could have been said that in paying the loss, the insurance companies were discharging an obligation, which, "in equity

and good conscience, should have been discharged by the water company." *Id.*, 2 S.W.2d at 1028.

Two Wisconsin cases, in which recovery for property damage was sought by subrogated insurers under the riot statute of that state, have cited *Burford* with approval. In *Interstate Fire & Casualty Co. v. City of Milwaukee*, 45 Wis. 2d 331, 173 N.W.2d 187 (1970), the court relied on public policy and equity principles in rejecting an effort by the insurer to recover. As the court noted, since liability was imposed without fault, the Wisconsin statute was "an absolute liability statute" under which the city did not become a wrongdoer. 173 N.W.2d at 191. The court stressed that subrogation was not "unavailable in all cases in which insurance companies have received premiums, but merely . . . where . . . the party against whom subrogation is sought is not a wrongdoer." *Id.* at 192. *Cf. American Ins. Co. v. City of Milwaukee*, 51 Wis. 2d 346, 187 N.W.2d 142 (1971) (same result where insurers sought reimbursement as assignees rather than as subrogees).

Similar results were reached in New Jersey and Pennsylvania. In *A. & B. Auto Stores of Jones St., Inc. v. City of Newark*, 59 N. J. 5, 279 A. 2d 693 (1971), the New Jersey Supreme Court held that the riot statute in that state barred subrogation to the claim of a riot victim because the statute imposed liability without regard to whether the municipality was at fault. "The city must indemnify the victim of a riot even if [its] performance was flawless." *Id.* at 703. Given such a statute, the public policy-equity principle argument prevailed. That a contrary result might well have been reached had fault been the basis for liability under the statute was clearly emphasized by the court.

Faced with a similar statute,[3] the Commonwealth Court of Pennsylvania arrived at the same result in *Wolf v. County of Allegheny*, 3 Pa. Commw. Ct. 27, 281 A. 2d 82 (1971). Since the statute was premised on strict liability, rather than on the county's status as a wrongdoer, the doctrine of

---

**3.** The Pennsylvania riot statute was repealed in 1970. *See* Wolf v. County of Allegheny, 3 Pa. Commw. Ct. 27, 281 A. 2d 82, 83 n. 1 (1971).

subrogation was not available as a ground for recovery. This the court underscored as the basis for its holding:

"We must emphasize here that the County is not a wrongdoer. It committed no wrong which caused the damage in this case. Ordinarily, subrogation can be enforced only against wrongdoers and not against innocent persons." 281 A. 2d at 84.

The common thread running through the cases on which the City relies, then, is the strict liability nature of the particular riot statute in issue. In each instance, the statute subjected the political subdivision to liability without regard to whether it was negligent or otherwise at fault. For this reason, and this reason alone, the Wisconsin, New Jersey and Pennsylvania courts denied recovery by subrogation, not only because of the inapplicability of the equitable principles from which the doctrine springs, since there was no wrongdoing by the local governmental body, but also because considerations of public policy made it unjust for members of the community to shoulder the loss. The concept of communal responsibility was simply not applicable in such circumstances.

Article 82, however, is not a strict liability statute, as Judge Greenfeld recognized.[4] As we have indicated, the statute here sounds in negligence. It is couched in such terms as having "had good reason to believe that such riot . . . was about to take place"; or, having taken place, that the local governmental unit "had notice of the same in time to prevent . . . injury or destruction"; and, in terms virtually unique to the Maryland statute, precludes liability "unless the authorities having notice have also the ability of themselves, or with their own citizens, to prevent said injury." Finally, § 3 of Article 82 eliminates all possible

---

4. As of 1968, Maryland was one of only three states having riot statutes, Connecticut and Kentucky being the others, which disallowed recovery "when city or police authorities could not have prevented the riot through the exercise of reasonable diligence." Note, *Riot Insurance*, 77 Yale L. J. 541, 553 (1968) (footnote omitted). Further, Maryland is among the few states requiring proof that the authorities "have had the actual ability to prevent the injury complained of." *Id.* n. 80.

doubt that negligence is the touchstone of liability by barring recovery in those cases in which "it shall be satisfactorily proved that the civil authorities and citizens of said county, town or city, when called on by the civil authorities thereof, have used all *reasonable diligence* and all the powers intrusted to them for the prevention or suppression of such riotous or unlawful assemblages." (Emphasis added). We settled the proposition that Article 82 is founded on negligence, rather than on strict liability, in *City of Baltimore v. Silver*, 263 Md. at 446:

> "A reading of the Maryland statute makes it abundantly clear that the core of the statutory liability for riot damages is *negligence* on the part of those in authority who are charged with the responsibility and are vested with the power to maintain public peace. Some statutes raise the conclusive presumption that the occurrence of riot damage was caused by the local government's failure to properly use its power and authority to maintain peace, but such is not the case with the Maryland law . . . ." (Emphasis added).

See *Hagerstown v. Dechert*, 32 Md. 369, 386 (1870) (". . . The provisions of the Code under which the suit is brought, expressly make the corporation liable for neglect of duty on the part of the authorities or officers of the town.")

Once it is recognized that the Maryland statute is bottomed on fault, rather than on strict liability, the City is stripped of its argument that it is insulated from liability to a subrogated insurer. Among the three distinct types of subrogation we have cataloged in our prior cases is conventional subrogation, founded on an agreement by which one, having paid the debt of another, is entitled and subrogated to the rights and securities of the debtor so paid. *Security Ins. Co. v. Mangan*, 250 Md. 241, 246, 242 A. 2d 482 (1968). The argument that it would be inequitable to require reimbursement from the City to an insurer who has been

paid premiums is without substance. If it were valid, the same reasoning would deny recovery to every insurer who sought to recoup from the wrongdoer losses which the insurer was paid to insure.

In the face of a riot statute which imposes liability only where there is fault, the public policy-equity principle argument does not apply. To the extent that the communal responsibility rationale remains viable, it is applicable where the damages which the statute seeks to redress are caused by the community itself. As Judge Greenfeld pointedly observed, whether the City was actually negligent remains to be determined.

We hold, therefore, that an insurer of property which has been damaged, destroyed or removed in such manner as to invoke liability on the part of the City under Article 82 may be subrogated to the rights of its insured for the loss which it has sustained.

*Judgment affirmed; costs to be paid by the Mayor and City Council of Baltimore.*