695 A.2d 171

**BOARD OF COUNTY COMMISSIONERS OF GARRETT COUNTY, MARYLAND**

v.

**BELL ATLANTIC–MARYLAND, INC.**

No. 67, Sept. Term, 1996.

Court of Appeals of Maryland.

June 19, 1997.

162

Joseph S. Kaufman (Shulman & Kaufman, L.L.C., on brief), Baltimore, for Petitioner.

Alice Kelley Scanlon (John A. Rego, Anderson & Quinn, on brief), Rockville, for Respondent.

Argued before BELL, C.J., and ELDRIDGE, RODOWSKY, CHASANOW, KARWACKI, RAKER and WILNER, JJ.

KARWACKI, Judge.

Maryland Code (1991 Repl.Vol.), Article 78, § 28A,[1] otherwise known as Maryland's "Miss Utility Act," ("Miss Utility" or "the Act") was enacted to protect the property of public service companies and other entities from various traumas in order to safeguard the public safety, health, and welfare. This case requires us to construe that Act.

## I.

Sometime in 1967, the Chesapeake and Potomac Telephone Company ("C & P")[2] buried two separate underground telephone cables in the Orendorf and Mosser Road areas of Garrett County, Maryland ("the County"). At the time, no written agreement existed between the County and C & P authorizing the interment. According to the Respondent, Bell Atlantic–Maryland, Inc. ("Bell"), unidentified officials of the County Roads Department granted it oral permission to lay cables along its roads wherever necessary.

### a.

In late 1992, the County Roads Department initiated an improvement feasibility study for Orendorf Road, and in January of 1993, planning for a major improvement of that road commenced. The County sought both to realign and widen Orendorf Road. Accordingly, it advised various utilities, including Bell, of its intentions.

Preliminary work on the project began in February 1993 with tree, stump, and brush removal. The undertaking, however, eventually required excavation work—the primary target of Miss Utility.

---

1. Unless indicated otherwise, all future statutory references in this opinion will be to Maryland Code (1991 Repl.Vol.), Article 78, § 28A.

2. The Chesapeake & Potomac Telephone Company, Inc. is currently known as Bell Atlantic–Maryland, Inc., the Respondent in the case *sub judice*.

*Inter alia,* the statute requires owners of underground facilities, such as telephone cables, to participate in a "one-call system." [3] That system compels owners of such facilities to provide the Public Service Commission ("Commission") with the telephone number of a person in every county of this State to whom calls from those contemplating excavation should be directed. *See* § 28A(c)(1)-(2)(i)-(ii). Miss Utility concomitantly obliges contractors and other persons, in addition to further duties discussed *infra,* to use those numbers to inform the contact person on file with the Commission of the intent to excavate at least forty-eight hours before doing so, but not more than ten working days prior to the proposed excavation. *See* § 28A(e)(1).

Once notified, the facility owner must determine within forty-eight hours whether or not the proposed excavation is within five feet of the horizontal plane of an underground facility or whether area blasting may disturb or damage any such facility. *See* § 28A(c)(2)(iii). Once that determination is made, the facility owner must then notify the contractor of the potential for harm and then appropriately mark the facility on either side of an eighteen inch horizontal plane, unless the proposed excavation is by blasting, which requires a demarcation of five feet. *See* § 28A(c)(2)(iv-vi).

In this context and in anticipation of necessary excavation work, Stuart Sommers, an Area Supervisor employed by the County Roads Department, contacted the "one-call" center in March of 1993. Accordingly, Bell began cable location efforts along the affected portion of Orendorf Road.

In an inadvertent worksite meeting with a Bell technician, Sommers allegedly expressed concern over the precise location of the Orendorf Road cable given that the project involved approximately one mile of roadway. According to Sommers, the technician agreed to "drop by and regulate or check on the progress of the work" and make additional "locates" if needed.

---

3. Like its statutory creator, the "one-call system" is also popularly known as "Miss Utility."

A second location attempt was made in late May or early June of 1993. Despite these contacts between Bell and the County, not every inch of cable was located along the project route.

As the work progressed, crews encountered a "hump" in the earth on or about June 23, 1993. Aware of the presence of the Bell cable, road engineers restricted excavation to twelve inches, believing the cable to be buried at least twenty-four inches deep. The project crew employed a large earth grader in an attempt to lessen the "hump" within the maximum cut depth established by the engineers. After several passes, the grader severed Bell's cable. No call was made to Miss Utility or any one at Bell to determine if a cable occupied the area under the "hump."

### b.

In 1991, farmland adjoining Mosser Road in Garrett County was under residential community development. The entrance to this new development was located within twenty-five to thirty feet of a drop-inlet—a concrete box designed to intercept water runoff from the uphill side of Mosser Road. Due to increased traffic and the proximity of the drop inlet to the new development, the County Roads Department deemed it a safety hazard.[4] Accordingly, the County decided to raise a traffic-bearing grate traversing the drop inlet by raising the drop inlet itself. This necessarily required the removal of a small amount of earth. During that excavation, County workers damaged a Bell–Atlantic telephone cable with a backhoe. No call to Miss Utility or any one else preceded the excavation.

### c.

As a result of the damage to its cables, Bell filed two separate complaints against the Garrett County Roads Department in the District Court of Maryland sitting in Garrett

---

4. According to Sommers, the hazard stemmed from the possibility that anyone accidentally leaving the roadway entering or exiting the new development would "drop into a hole."

County.[5] Both complaints sounded in negligence and alleged that the "Garrett County Roads Department ... failed to take reasonable precautions to prevent damage" to Bell's cables, proximately causing their harm. Following the presentation of evidence by both Bell and the County, the District Court entered judgment in favor of Bell in both actions in the amounts of $1447.66 and $1846.37, respectively.

The County appealed those judgments to the Circuit Court for Garrett County. Following a trial *de novo*, the circuit court issued a Memorandum and Order, concluding that "[the County] was in violation of [Miss Utility] in each case" and that "no persuasive evidence of contributory negligence on the part of [Bell]" was presented, and the defense, therefore, not established. However, the court ordered reargument on the issue of whether Bell fit the definition of "owner" as contemplated by § 28A(b)(4)(i)-(ii) of the Act. Subsequent to reargument, the court agreed that Bell fit that definition and entered judgment in its favor in both actions. Upon the County's Petition, we issued a Writ of Certiorari to review those judgments.

## II.

The Miss Utility Act was enacted by Chapter 863 of the Acts of 1974, and originally codified as Md.Code (1969 Repl. Vol., 1974 Cum.Supp.), Art. 78, § 28A. The Act was captioned "Public Service Commission Law UNDERGROUND FACILITIES." It aspired to:

"protect underground facilities of public service companies from destruction, damage or dislocation in order to prevent:

(1) Death or injury to persons.

(2) Property damage to private and public property.

---

5. The Complaints stemming from the Orendorf and Mosser Road breaks were respectively numbered (No. 0000396–94) and (No. 0000397–94).

(3) Loss of services of public service companies to the general public ."

Although § 28A has undergone various modifications since its enactment, its primary objectives have not. *See* § 28A(a)(1)-(3).

Miss Utility discourages would-be excavators from noncompliance upon peril of liability for damages and civil penalties. Section 28A(h) provides:

"If any underground facility is damaged by any person or contractor who has failed to comply with any provision of this section, that person or contractor shall be deemed negligent and shall be liable to the owner of the underground facility for the total cost of the repair."

Similarly, § 28A(h)(i) provides in relevant part:

"Any person or contractor who excavates without first giving the notice required in subsection (e) of this section, and who damages, dislocates or disturbs an underground facility, shall be deemed negligent and shall be subject to a civil penalty up to $1,000 for the first offense and $1,000 for each subsequent offense, or ten times the cost of repairing the damage to the underground facility."

As indicated, *supra*, owners of underground facilities are obliged to participate in the "one-call" notification system established by Miss Utility.[6] The Act defines an "owner" as

"a public utility, telecommunications or cable television corporation, political subdivision, municipality, authority, or other person that:

(i) Owns or operates an underground facility; and

---

6. Miss Utility defines an underground facility in § 28A(b)(6)(i) as

"any item of personal property which shall be buried or placed below ground or submerged for use in connection with the storage or conveyance of water, sewage, electronic, telephonic, or telegraphic communications, electric energy, oil, gas or other substances, and shall include but not be limited to pipes, sewers, conduits, cables, valves, lines, wires, manholes, attachments and those portions of poles below ground."

(ii) Has the right to bury an underground facility."
§ 28A(b)(4)(i)-(ii).

### III.

The County seizes upon this language and asserts that Bell is not an "owner" within the contemplation of Miss Utility because it did not possess the "right" to inter its cables at either the Orendorf or Mosser Road locations. In the County's view, Bell failed to establish this right because it produced insufficient evidence of a conveyance from the County to Bell granting the latter a right-of-way, *i.e.*, an easement. The County posits that any such conveyance would necessarily be subject to the statute of frauds contained in Md.Code (1988 Repl.Vol., 1993 Supp.) § 5–104 of the Real Property Article. Thus, the argument goes, because Bell was not an "owner" as envisioned by Miss Utility, its property was not entitled to the Act's protection.

For its part, Bell argues that the history and wording of Miss Utility reveals a legislative intent to identify all public utilities, including Bell, as "owner[s]" of underground facilities within the meaning of § 28A(b)(4)(i)-(ii), free of any concomitant obligation to establish a "right to bury an underground facility." Although we disagree with Bell's reading of § 28A(b)(4)(i)-(ii), we nonetheless conclude that the General Assembly granted Bell a franchise to place its cables in the Orendorf and Mosser Road areas of Garrett County, thereby bringing it within the definition of "owner" as envisioned by Miss Utility.

### a.

In construing any statute, our principal aim is to effect the intent of the Legislature, and in order to do so, our first resort must be to the language of the statute itself. *Klingenberg v. Klingenberg*, 342 Md. 315, 327, 675 A.2d 551, 557 (1996); *Kaczorowski v. Mayor and City Council of Baltimore*, 309 Md. 505, 514–15, 525 A.2d 628, 632 (1987). Ordinarily, where that language is clear, our probe for legislative intent begins and ends. *Polomski v. Mayor and City Council*

*of Baltimore,* 344 Md. 70, 74, 684 A.2d 1338, 1340 (1996); *Scaggs v. Baltimore W.R. Co.,* 10 Md. 268 (1856).

■ In Bell's view, only "other person[s]" not among the enumerated entities in § 28A(b)(4) must establish the right to bury an underground facility before enjoying the protection of Miss Utility. Stated otherwise, Bell contends that it possesses the right to bury its cables anywhere it chooses because it *is* a telecommunications corporation. A cursory perusal of § 28A(b)(4)(i)-(ii) belies that assertion.

That section provides that "a public utility, telecommunications or cable television corporation, political subdivision, municipality, authority, or other person" is an owner for the purposes of Miss Utility to the extent "that [it] (i)[o]wns or operates an underground facility; and (ii)[h]as the right to bury an underground facility." Subsections (i) and (ii) clearly modify and qualify subsection (4) insofar as the entities enumerated therein are not owners within the contemplation of Miss Utility unless they meet the conditions set forth in subsections (b)(4)(i)-(ii).

Although it may be true, as Bell points out, that the 1990 amendments to Miss Utility[7] were designed in part to "expand the protections afforded to owners of underground facilities provided by the statute," we find nothing in those amendments or their legislative history to suggest that Miss Utility granted Bell, much less any public utility, a license to bury its facilities at whim without first establishing a corresponding right to do so. Any other view of § 28A(b)(4)(i)-(ii) runs contrary to its clear import.

In essence, Bell asserts the right to sue a property owner for violations of Miss Utility even though any resultant damage occurred on property that Bell possessed no colorable right to occupy. *See Baltimore Gas and Elec. Co. v. Lane,* 338 Md. 34, 47, 656 A.2d 307, 313 (1995)(right to exclude others from property is an incidence of legal possession). It is absurd to suggest that a property owner has the right to

---

7. *See* Ch. 440 of the Acts of 1990.

exclude others, but once Bell, or any other utility, makes a successful incursion, Miss Utility protects the interloper's property. We have long held that "[t]o a trespasser—one on the property [of another] without permission—the possessor owes no duty 'except to refrain from willfully or wantonly injuring ... the trespasser.'" *Lane, supra,* 338 Md. 34, 44, 656 A.2d 307, 312 (1995)(*quoting Sherman v. Suburban Trust Co.,* 282 Md. 238, 242, 384 A.2d 76, 79 (1978)); *see also Rosenblatt v. Exxon,* 335 Md. 58, 78, 642 A.2d 180, 190 (1994)(trespass involves tortiously placing something on the land of another).

■ We glean no legislative intent in Miss Utility to abrogate this long-standing common law rule, and indeed, the statute is perfectly consistent with it. Thus, an underground facility proprietor must show, *inter alia,* that it had a right to bury the underground facility before enjoying the protective provisions of Miss Utility. Any other conclusion ignores the manifest intent of Art. 28A(b)(4)(i)-(ii).

Assuming as much, Bell asserts that its right to bury the Orendorf and Mosser Road cables flowed from two sources— first, from a statewide franchise granted to Bell by the General Assembly, and by express permission from officials of the Garrett County Roads Department. In order to address these assertions properly, we must examine the past.

**b.**

The dawn of the telecommunications age broke with the advent of the telegraph nearly a century and a half ago. In response, the General Assembly in "AN ACT to provide for the Incorporation and Regulation of Telegraph Companies in this State" granted telegraph companies the right to, *inter alia,*

"construct lines of telegraph along and upon any of the public roads and highways, or across any of the waters within the limits of this State, by the erection of the necessary fixtures, including posts, piers or abutments, for sustaining the cords or wires of such lines; *Provided,* the

same shall not be so constructed as to incommode the public use of said roads or highways, or injuriously interrupt the navigation of said waters, nor shall this act be so construed as to authorise [sic] the construction of any bridge across any of the waters of this State." (Original emphasis). See Ch. 369, § 5 of the Acts of 1852. That Act was first codified as Public General Laws (1860), Art. 26,[8] § 107.

Law and change being close relatives, by Chapter 471 of the Acts of 1868, the Legislature repealed Art. 26, and replaced it entirely. Lawmakers, however, continued the right of telegraph corporations respectively to exist, grow through acquisition, and construct lines of telegraph

"through this State, or from or to any point or points within this State or upon the boundaries thereof, and along and upon any postal roads and postal routes, roads, streets and highways ... by the erection of the necessary fixtures, including posts, piers or abutments for sustaining the cords or wires of such lines, *without their being deemed a public nuisance or subject to be abated by any private party* [.]" (Emphasis added).

See Ch. 471, §§ 127–129 of the Acts of 1868.

By 1967, that above-quoted provision was codified and amended as Md.Code (1957, 1966 Repl.Vol.), Art. 23, § 318 without substantial modification and is currently codified and amended as Md.Code (1957, 1996 Repl.Vol.), Art. 23, § 318.

Nearly two decades following first enactment of the predecessor to Art. 23, § 318, the Legislature amended Chapter 471 of the Acts of 1868, by additionally conferring upon telegraph companies the right to

"construct and lay any part of its said line or lines under ground on any route on which it is authorized to construct such lines, in whole or in part, above ground, and may acquire by condemnation any easements or interests in land

---

8. Pub. Gen. Laws (1860), Art. 26, *et seq.* served as Maryland's first general "**Corporations**" Article.

which may be necessary to give effect to the purposes for which such corporation was formed. . . ."

Ch. 161, § 175A of the Acts of 1886. That Act was codified as amended in 1967, as Md.Code (1957, 1966 Repl.Vol.), Art. 23, § 340, and is currently codified as Md.Code (1957, 1996 Repl. Vol.), Art. 23, § 340. Significantly, the powers initially granted to telegraph companies by the two aforementioned acts were extended to telephone companies by Chapter 360 of the Acts of 1884 and by Chapter 240, § 366 of the Acts of 1908. *See also* Md.Code (1957, 1966 Repl.Vol.), Art. 23, § 326.

Bell asserts that the Legislature granted it, under §§ 318 and 340, a State-wide franchise to bury its cables "along and upon any postal roads and postal routes, roads, streets and highways." The county retorts by asserting that "properly" read, § 318 only frees a public utility from nuisance actions for facilities placed along those public rights-of-way. It in no way establishes a primary right of occupation. The county similarly maintains that § 340 grants no more rights than those conferred by § 318, save for the power of condemnation.

**c.**

Viewed in historical context, §§ 318 and 340, support Bell's position. Chapter 369, § 5 of the Acts of 1852, and its codification at Public General Laws (1860), Art. 26, § 5, expressly granted telegraph corporations the right or franchise to employ "the public roads and highways . . . of this State" to serve its own ends, so long as such use did not "incommode the public use of said roads or highways." Stated otherwise, the Legislature granted telegraph companies the franchise to use the public roadways for its cabling purposes, subject only to the avoidance of public inconvenience.

Upon the repeal of Art. 26, Ch. 471, § 129 of the Acts of 1868 retained without substantial modification the original franchise formerly granted to telegraph corporations to carry out their objectives through use of public roadways by erecting the "*necessary fixtures,*" with the added proviso that such use would not be "*deemed a public nuisance or subject to be abated by any private party.*" (Emphasis added). Rather

than detracting from the original rights initially enjoyed by telegraph corporations, Ch. 471, § 129 of the Acts of 1868 enlarged the franchise to shield franchisees from the vexation of nuisance suits.

Shortly thereafter, and as indicated in Part II.b., *supra*, the Legislature acted to enlarge the franchise once again. This time, telegraph corporations gained the right to inter cables along above-ground routes and the authority to condemn private property for public use. Ch. 161, § 175A of the Acts of 1886. Since that time, those Acts have changed little, and in no way pertinent to the instant case.

■ Thus, the County's assertion that § 318 only "exempts [the subject] cables from being deemed public nuisances or being subject to abatement" lacks merit. The history of §§ 318 and 340 reveals that the General Assembly intended telephone and telegraph corporations make full use of the State's public roadways to accomplish their objectives [9] for the benefit of those corporations and the public alike. That the right to do so is in some measure conditional [10] in no way negates its existence.

---

**9.** The only express caveat to the franchise is that expressed in § 340, providing that corporations incorporated under the provisions of § 318 "obtain the assent and approval of the Mayor and City Council of Baltimore City, before using the streets or highways of Baltimore City, either the surface or the ground beneath the same."

**10.** *See, e.g., American Tel. & Tel. Co. v. Pearce,* 71 Md. 535, 18 A. 910 (1889)(notion that statute authorizes public utility to occupy private land prior to compensation is inconsistent with Md. Const., Art. III, § 40); *Postal Tel. Cable Co. v. State Roads Comm'n.,* 127 Md. 243, 96 A. 439 (1915); *C & P Tel. Co. v. State Roads Comm'n,* 132 Md. 194, 103 A. 447 (1918); *C & P Tel. Co. v. State Roads Comm'n,* 134 Md. 1, 106 A. 257 (1919)(state entitled to recover compensation for corporation's use of public highways and bridges); *Mayor and City Council of Baltimore v. C & P Tel. Co.,* 142 Md. 79, 120 A. 229 (1923)(City of Baltimore within rights to exact a pole rental fee for telephone company's use of the streets); *Johnson v. Consolidated Gas & Elec. Light & Power Co.,* 187 Md. 454, 50 A.2d 918 (1947)(pole which endangers public safety must be regarded as incommoding the public and therefore subject to abatement). *See also* Md.Code (1957, 1965 Repl.Vol.), Art. 78, § 24(a)(no public service company shall exercise any franchise granted

### d.

The County also maintains that a public service corporation's right to occupy public streets and roadways is tantamount to an interest in land subject to the statute of frauds codified at § 5-104 of the Real Property Article. It provides:

"No action may be brought on any contract for the sale or disposition or land or of any interest in or concerning land unless the contract on which the action is brought, or some memorandum or note of it, is in writing and signed by the party to be charged or some other person lawfully authorized by him."

██ As the County sees it, Bell's claim of interest in the County's roadways is an easement which Bell could have only acquired via a written instrument—an instrument absent from the evidentiary record. To answer this contention, we need only turn to *Consol. Gas Co. v. Mayor and City Council of Baltimore,* 101 Md. 541, 61 A. 532 (1905). In distinguishing the characteristics of an easement from those of a franchise, our predecessors observed that

"In every instance of a private easement—that is, an easement not enjoyed by the public—there exists the characteristic feature of two distinct tenements—one dominant and the other servient. On the other hand, a franchise is a special privilege conferred by government on individuals, which does not belong to the citizens of the country generally by common right. *A franchise does not involve an interest in land—it is not real estate but a privilege which may be owned without the acquisition of real property at all.* (Emphasis added). The *use* of a franchise *may* require the occupancy, or even the ownership, of land; but that circumstance does not make the franchise itself an interest *in* land." (Citation omitted)(Original emphasis).

101 Md. at 545, 61 A. at 534. Though it is true that "the *right* to occupy the street . . . is a franchise" and the "*occupation* of

by law except to the extent authorized by the Public Service Commission).

them ... pursuant to the franchise is the acquisition of an *easement*," 101 Md. at 546, 61 A. at 534, the right to acquire the easement flows from the Legislature, not from private contract. Thus, the statute of frauds has no applicability to franchise rights or the exercise thereof.

## IV.

Assuming the applicability of Miss Utility, the County next contends that the circuit court erred by "proceed[ing] on a theory of strict liability." Although both actions below sounded in negligence, Bell at times argued that strict liability attached to the County's conceded violations of Miss Utility. Be that as it may, we glean no evidence from the record that the trial court proceeded on any such theory. Even assuming otherwise, we hold that there was sufficient evidence in the record to support the trial court's judgment in each of the two negligence actions below.

### a.

■ The County correctly argues that Miss Utility is not a strict liability statute. Under § 28A(h), any person or contractor who violates any section of Miss Utility "shall be deemed negligent and shall be liable to the owner of the underground facility for the total cost of the repair." At trial, Bell contended that § 28A(h) imposes strict liability upon the County for its failure to comply with Miss Utility's notification provisions. We disagree.

An excavator's primary obligations under Miss Utility are set forth in § 28A(e)(1)-(4):

"(e) *Excavation; notice and **due care requirements.*** — Each person or contractor who intends to perform excavation work in this State shall:

(1) Telephone the person identified in subsection (c) of this section, and notify that person of the intent to perform the proposed excavation at least 48 hours (excluding Saturdays, Sundays, and legal holidays), but not more than 10, working days before starting excavation;

(2) Repeat the notification required in paragraph (1) of this subsection if:

(i) The excavation has not commenced within 10 working days; or

(ii) The excavation will be expanded beyond its original location;

(3) Exercise *due care* to avoid interference with or damage to an underground facility that an owner has marked in accordance with subsection (c) of this section; and

(4) Immediately notify the owner of an underground facility if the contractor discovers or causes any disturbance or damage to that underground facility." (Emphasis added).[11]

"Due care" is a negligence concept, and therefore inconsistent with the genre of strict liability or liability without fault. *See* BLACK'S LAW DICTIONARY 1422 (6th ed.1990); *see also Mayor and City Council of Baltimore v. Blibaum*, 280 Md. 652, 662–63, 374 A.2d 1152, 1158 (1977) (statute couched in negligence terms is not a strict liability statute). Yet according to Bell, a violation of § 28A(e)(3) renders violators strictly liable—strictly liable for failure to exercise due care. That argument is logically infirm. Liability for failure to exercise due care is not strict liability, but rather liability for damages proximately resulting from the wrongful breach of a legally cognizable duty, *i.e.*, negligence.[12]

---

11. In fact, anyone contemplating excavation "may not begin excavation prior to the marking required by this section or notification by each owner, or by the one-call system, that marking is unnecessary." § 28A(f).

12. In support of its position, Bell points to a decision by the Supreme Court of Arizona which held that Ariz.Rev.Stat. Ann. §§ 40–360.21—40–360.29 (19__), Arizona's "Miss Utility" statute, holds violators strictly liable for failing to comply with its provisions. *See Sedona Self Realization Group v. Sun–Up Water*, 123 Ariz. 168, 170, 598 P.2d 987, 989 (1979). Section 40–360.22.A. of that Act provides:

"A person shall not make or begin any excavation in any public street, alley, right-of-way dedicated to the public use or utility easement or on any express or implied private property utility easement without first determining whether underground facilities will be encountered, and if so where they are located from each and every

When interpreting any statute, we must look to the entire statutory scheme, and not any one provision in isolation, to effect the statute's general policies and purposes. *Morris v. Osmose Wood Preserving,* 340 Md. 519, 539, 667 A.2d 624, 634 (1995); *City of Annapolis v. State,* 30 Md. 112, 117 (1869). In so doing, we must both harmonize the statute's constituent provisions, *Gardner v. State,* 344 Md. 642, 650, 689 A.2d 610, 614 (1997), and avoid interpretations which render any part of the statute meaningless or superfluous. *See Polomski, supra,* 344 Md. at 83, 684 A.2d at 1344; *Welsh v. Kuntz,* 196 Md. 86, 98–99, 75 A.2d 343, 348 (1950).

As indicated, "due care" is but one of two duties of those contemplating excavation under Miss Utility. Excavators must also notify owners of underground facilities in the manner specified by the Act prior to penetrating the earth, § 28A(e)(1)-(2)(i)(ii), and immediately after disturbing or damaging any such facility. § 28A(e)(1)-(4). Bell's interpretation of § 28A(h) focuses only upon the County's failure to comply with the latter and forsakes the obvious implication of the provisions specifying the standard of "due care" to which excavators must conform. If Miss Utility is a strict liability statute, as Bell contends, the statute's due care provisions seemingly lack purpose. We cannot countenance such a construction without doing violence to the principles of statutory construction articulated above.

Moreover, under § 28A(e)(1), an excavator must contact the owner of the underground facility "at least 48 hours (excluding Saturdays, Sundays, and legal holidays), but not more than 10, working days before starting excavation." In Bell's view, an excavator who contacts an owner eleven work-

---

public utility, municipal corporation or other person having the right to bury such underground facilities within the public street, alley, right-of-way or utility easement and taking measures for control of the facilities in a careful and prudent manner."
Although the Arizona statute employs negligence terms such as "careful and prudent," the Arizona Supreme Court nonetheless concluded that § 40–360.22.A. is a strict liability statute. For the reasons stated *infra,* we reject a similar construction of our own statute.

ing days prior to the excavation, and obtains the appropriate facility markings, but who otherwise exercises due care, is nonetheless strictly liable for damages under § 28A(h) for violating "any provision of [Miss Utility]." We ordinarily avoid the construction of a statute which leads to unreasonable, illogical, unjust or nonsensical results. *D & Y, Inc. v. Winston,* 320 Md. 534, 538, 578 A.2d 1177, 1179 (1990); *Pan Am. Sulphur v. State Dep't,* 251 Md. 620, 627, 248 A.2d 354, 358 (1968). Yet, the practical implication of the construction of Miss Utility urged by Bell would rain potentially enormous liability upon an excavator who did nothing more than violate a ministerial time provision. We will not presume that the Legislature intended such an unjustly harsh result or a radical departure from the common law of negligence without a plain statement of its intention to do so. *Molesworth v. Brandon,* 341 Md. 621, 632–24, 672 A.2d 608, 614 (1996); *Bradshaw v. Prince George's County,* 284 Md. 294, 302, 396 A.2d 255, 260 (1979); *Lutz v. State,* 167 Md. 12, 15, 172 A. 354, 355–56 (1934). Viewed in its entirety, we cannot conclude that Miss Utility commands such a result or otherwise evidences a legislative intent to substitute strict liability in situations where principles of negligence would otherwise and ordinarily apply.

## V.

In concluding that Miss Utility is not a strict liability statute, however, we by no means suggest that violations of the Act cannot form the basis of civil liability. This Court has consistently held that the violation of a statutory duty may furnish evidence of negligence. *Atlantic Mutual v. Kenney,* 323 Md. 116, 124, 591 A.2d 507, 510 (1991); *Aravanis v. Eisenberg,* 237 Md. 242, 259–60, 206 A.2d 148, 158 (1965); *Ford v. Bradford,* 213 Md. 534, 541, 132 A.2d 488, 491–92 (1957). The positive evidentiary value of a statutory violation, however, is subject to the condition that "the person alleging negligence is within the class of persons sought to be protected, and the harm suffered is of the kind which the statute was intended, in general, to prevent." *Atlantic Mutual, supra,*

323 Md. at 124, 591 A.2d at 510–11; *Owens v. Simon,* 245 Md. 404, 409, 226 A.2d 548, 551 (1967).

Clearly, Bell is among the persons or entities that Miss Utility seeks to protect. Much the same can be said regarding the harm that befell Bell's cables. A statute that requires underground facilities to be marked prior to excavation in the vicinity is obviously designed to prevent damage to those facilities. Indeed, the Act's preamble leaves no ambiguity on either score. § 28A(a)(1)-(3). Regardless, no action lies for the alleged breach of a duty—whether imposed by statute or by common law—unless the resultant harm proximately results from the breach. *Atlantic Mutual,* 323 Md. at 127, 591 A.2d at 512 (*citing Cramer v. Housing Opportunities Comm'n,* 304 Md. 705, 712–13, 501 A.2d 35, 38–39 (1985)).

### a.

▆▆▆▆ Conceding violations of Miss Utility, the County attempts to implicate Bell's agency in the Orendorf and Mosser Road events. Under Maryland law, contributory negligence of a plaintiff will ordinarily bar his, her, or its recovery. Contributory negligence is that degree of reasonable and ordinary care that a plaintiff fails to undertake in the face of an appreciable risk which cooperates with the defendant's negligence in bringing about the plaintiff's harm. *Wegad v. Howard Street Jewelers,* 326 Md. 409, 418, 605 A.2d 123, 128 (1992); *Menish v. Polinger Co.,* 277 Md. 553, 559, 356 A.2d 233, 236 (1976). As with any affirmative defense, contributory negligence will not bar a plaintiff's claim unless and until the defendant has proven its elements by a preponderance of the evidence.[13] *Myers v. Bright,* 327 Md. 395, 403, 609 A.2d 1182,

---

13. Bell suggests that Miss Utility is among those statutes that place the entire responsibility for the harm that has occurred upon a defendant, because Bell is among a "certain class of persons [who are unable] to protect themselves." *See Brady v. Parsons Company,* 327 Md. 275, 292, 609 A.2d 297, 305 (1992). *Brady* illustrated this point by pointing to those statutes that prevent the sale of firearms to minors. In so doing, this Court observed that "the purpose of [these] statute[s] would be defeated if the contributory negligence of the minor were permitted to bar his [or her] recovery. The predicate for that observation is the

1186 (1992); *Baltimore & Ohio Rail Co. v. State*, 60 Md. 449, 462 (1883).

 In this context, the County argues that the circuit court erroneously declined to find Bell contributorily negligent for failing to bury its cables in accordance with its own internal guidelines and pursuant to an alleged agreement between the County and Bell. Trial testimony revealed that in 1967, both Bell and the County deemed twenty-four inches to be an appropriate depth at which to bury telephone cables. Yet, both parties presented conflicting testimony concerning the depth of the cables when the damage to them occurred.

Predictably, the County presented testimony tending to show that the cables were well above the twenty-four inch standard, while Bell presented testimony indicating that the cables were interred below, and in some cases, well below that depth. Bell additionally presented testimony that suggested that accurate measurements were difficult to obtain because the cut areas had already been excavated to some degree and because the force of the cut dislocated the cable upwards toward the surface.

Significantly, the County presented no testimony establishing the depth at which the Orendorf and Mosser Road cables were buried in 1967, relying instead on an inference that it was somewhat less than the "requisite" twenty-four inches. In response, Bell presented witnesses who testified that forces such as erosion, ground settlement, general excavation, and road widenings potentially affect the depth of a cable over time.

The trial judge concluded that the County failed to establish a defense of contributory negligence. In fact, the trial judge expressly found the County's depth evidence "unpersuasive," as he was entitled to do as the trier of fact. *See Jones v. State*, 343 Md. 448, 460, 682 A.2d 248, 254 (1996)(trier of fact

---

presumption that minors are legally unable to protect themselves." 327 Md. at 292, 609 A.2d at 305. Bell is entitled to no such presumption.

decides which evidence to accept and which to reject). In reviewing that conclusion after considering the evidence in Bell's favor as we must, our sole function is to determine whether the trial court's finding is supported by substantial evidence. *Urban Site v. Levering*, 340 Md. 223, 230, 665 A.2d 1062, 1065 (1995); *Goodwin v. Lumbermens Mut. Cas. Co.*, 199 Md. 121, 129, 85 A.2d 759, 762 (1952). We conclude that it was.

Given that the burden fell to the County to establish contributory negligence on Bell's part, the court found that the lack of precise measurements at the damage locations precluded such a finding. Moreover, the court chose to accept the testimony presented by Bell that the "depth of [a] cable will change over the years from a variety of causes." Those findings are not clearly erroneous or otherwise unsupported by substantial evidence, and they adequately support the trial court's rejection of the County's contributory negligence defense—a defense, we note, that may be available under Miss Utility in an appropriate case, as it ordinarily would be in any negligence action.

**b.**

In conjunction with its belief that the circuit court proceeded on a theory of strict liability, the County also contends that Bell proffered no evidence of negligence. Though conceding that statutory violations may serve as such evidence, the County maintains that its violations of Miss Utility were not the proximate cause of the damages suffered by Bell. Thus, the County argues, its violations of Miss Utility were of no evidentiary value. *See* part V., *supra.*

The County mounts this argument on the belief that Bell's cables were buried less than twenty-four inches from the surface. At least with respect to the Orendorf Road location, the County maintains that, based upon this belief, it modified its engineering plans and restricted excavation work to twelve inches, and encountered the Bell cable between eight and twelve inches below the surface. As to the Mosser Road location, the County's witness indicated that a backhoe struck

Bell's cable "[o]h, approximately six, eight, [or] ten inches" deep. As we have previously indicated, however, the trial court found those assertions "unpersuasive." Again, we will not disturb those findings.[14]

Undoubtedly, the County bore a legal obligation to avoid Bell's cables, both at common law[15] and under the various provisions of Miss Utility. *See, e.g.,* § 28A(e)(3). In fact, Miss Utility places the sole obligation on those contemplating excavation to employ its notification provisions prior to excavation and to exercise "due care" in the performance of their subterranean work to avoid damage to underground facilities. Section 28A cannot be read in any other fashion.

■ At the very least, the County breached its duty to notify Miss Utility in the manner specified by the Act. It made no attempt at notification prior to excavation at the Mosser Road site. On Orendorf Road, not only was notification untimely, it is undisputed that marking requests were not made in the area where the cable strike occurred.[16]

We are further convinced that the record adequately shows that the County breached its obligation of due care in both locations. At Mosser Road, the County utterly failed to comply with Miss Utility and made no independent attempt to determine whether any underground facility occupied the ex-

---

**14.** The County also suggests that, at least with regard to the Orendorf Road location, because Bell was contacted early in the process, and at times was on-site, its notice of the project gave it the greater opportunity to prevent the harm that had occurred. In our view, however, this latter view is nothing more than a renewed contributory negligence argument, which the trial court rejected.

**15.** *See Faya v. Almaraz,* 329 Md. 435, 449, 620 A.2d 327, 333 (1993)(seriousness of potential harm, as well as its probability, contributes to the duty to prevent it); *Flaccomio, v. Eysink,* 129 Md. 367, 381, 100 A. 510, 515 (1916)(it is the duty of every person to so conduct his business as not to expose, knowingly or negligently, others to imminent danger).

**16.** There was also evidence adduced that suggested that Bell had agreed to relocate its cables but that the County prematurely began excavation work, depriving Bell of the opportunity to do so.

cavation site. The same can be said for Orendorf Road. Although the County knew of the cable's presence, excavation proceeded without knowledge of its exact interment site. Moreover, Bell suffered a loss—namely, the damage to its cables and the resultant expense in repairing them.

Thus, the only issue seriously contested by the County with respect to its negligence is that of proximate cause. We have defined proximate cause as "1) a cause in fact, and 2) a legally cognizable cause." *Atlantic Mut.*, 323 Md. at 127, 591 A.2d at 512. As to the latter, foreseeability of harm and manner of occurrence are the primary indicia of legal cause. Quoting from the *Restatement (Second) of Torts* (1965), we have observed that:

"(1) If the actor's conduct is a substantial factor in bringing about harm to another, the fact that the actor neither foresaw nor should have foreseen the extent of the harm or the manner in which it occurred does not prevent him from being liable.

(2) The actor's conduct may be held not to be a legal cause of harm to another where after the event and looking back from the harm to the actor's negligent conduct, it appears to the court highly extraordinary that it should have brought about the harm."

323 Md. at 129–30, 591 A.2d at 513.

The crux of the County's argument in this regard is that had it complied fully with Miss Utility, the strikes still would have occurred. Thus, its violations of the Act were not the proximate cause of the accident. The County overlooks § 28(A)(d). It provides:

"(d) *Burden of Care.*—Obtaining information as required by this section does not excuse any person or contractor making any excavation from doing so in a careful and prudent manner, nor shall it excuse any person or contractor from liability for any damage or injury resulting from the excavation."

Although strictly speaking, mistiming notification under Miss Utility may not form a predicate for proximate cause, the

County did far more than fail to timely notify Miss Utility. Bell's cables were damaged for the simple and sole reason that the County failed to apprise itself of the precise location of those underground facilities prior to commencing excavation operations. Not only was this failure a substantial factor in bringing about the harm to Bell's property, but in retrospect, such a failure was highly likely to do so.

While it is true, as the County observes, that Miss Utility does not expressly require an owner to identify the depth of its underground facilities while marking them, we simply cannot credit an argument that suggests that excavating without accurate knowledge of what lies below the surface is "making [an] excavation . . . in a careful and prudent manner," as required by the Act. To do so would sanction carelessness in the face of risk and completely subvert the intent of Miss Utility.

Though owners of underground facilities have considerable duties under the statute, it is clear that Miss Utility places the overwhelming burden of ensuring the integrity of those facilities squarely upon excavators and those in their employ. By failing to do so, the County breached its legal duty and as a result, damaged Bell's subterranean telephone cables, inconveniencing Bell and the public alike.

Of the many underground facilities buried across this State, telephone cables rank among the most benign. In that regard, the County's negligence met with fortuity. Had the County's backhoe or grader struck a natural gas or high voltage line, the results may have been far more costly and tragic. The County's suggestion that Miss Utility protects only the property of public service corporations strains credulity and ignores the obvious intent and plain language of the Act. This case should serve as fair warning to anyone contemplating excavation. Compliance with Miss Utility is not a matter of discretion or convenience.

### JUDGMENTS AFFIRMED, WITH COSTS.