Dear Mr. Hillier:
On behalf of the Health Services Cost Review Commission ("HSCRC"), you have requested our opinion whether, in light of the consolidation of what was formerly known as the Montebello Center into Kernan Hospital, the State remains subject to § 13-405(d)(6) of the Education ("ED") Article, Maryland Code, which directs the State to pay an amount agreed to by the Department of Health and Mental Hygiene ("DHMH") and the University of Maryland Medical System Corporation ("UMMS") for "uncompensated care by Montebello."
Our opinion is that, if UMMS now serves at Kernan those rehabilitation patients who were traditionally served at Montebello, the consolidation of Montebello with Kernan does not relieve the State of its obligation to comply with ED, § 13-405(d)(6).
 I Transfer of Montebello to UMMS
In Chapter 248 (Senate Bill 373) of the Laws of Maryland 1992, the General Assembly provided for the transfer of the Montebello Center to UMMS. In transferring Montebello, the General Assembly sought to free DHMH from the "unnecessarily costly and administratively cumbersome" task of running Montebello; to assist UMMS in becoming a major national teaching and research center by the addition of a comprehensive inpatient rehabilitation facility; and to link Montebello with the service continuum that included the University Hospital and the Shock Trauma Center. See Preamble to Chapter 248.
Chapter 248 included provisions for the transfer of Montebello's assets to UMMS as well as for UMMS's assumption of Montebello's liabilities. See ED, § 13-402 and 403. In addition, Chapter 248 protected State employees working at Montebello by allowing them to transfer to other State positions or, if they chose to become UMMS employees, either to retain or to be compensated for accrued leave. See ED, § 13-404. Montebello employees who left State service were permitted to remain in the State pension system. Further, Chapter 248 provided that, if Montebello became subject to rate setting, the Governor was required to appropriate to UMMS the difference between pension costs for UMMS employees still in the State pension plan and those permitted by the HSCRC. See ED, § 13-405(e).
Specifically relevant to your request, Chapter 248 also directed the State to pay UMMS for the cost of uncompensated care at Montebello and to contribute to Montebello's capital financial needs. See ED, § 13-405. This payment requirement was predicated on Montebello's high population of Medicaid and "self-pay" patients and the fact that, without the State contribution, UMMS could not afford to renovate or replace Montebello's aging facilities. See Department of Fiscal Services, Analysis of 1992 Transfer Legislation at 4 (extracted from UMMS's Fiscal 1993 Budget Analysis) ("UMMS Fiscal Analysis").
ED, § 13-405(d) provides as follows:
 In recognition of the provision of uncompensated care by Montebello and to assist with the capital financial needs of Montebello specified as part of the transfer under § 13-402 of this subtitle, the State shall pay [UMMS]:
(1) In Fiscal Year 1993, $6,129,942;
(2) In Fiscal Year 1994, $5,500,000;
(3) In Fiscal Year 1995, $5,000,000;
(4) In Fiscal Year 1996, $5,000,000;
(5) In Fiscal Year 1997, $5,000,000; and
 (6) In each fiscal year thereafter, an amount jointly agreed upon by [DHMH] and [UMMS] and calculated to enable [UMMS] to continue to provide uncompensated care by Montebello and to assist with the capital financial needs of Montebello specified as part of the transfer under § 13-402 of this subtitle.
The funding arrangement would only be deemed void if UMMS "no longer operate[d] Montebello." ED, § 13-405(a)(2). In return for this compensation, Chapter 248 obligated UMMS to continue to provide rehabilitation or chronic care services to "the historic Montebello service population." ED, § 13-403.
Finally, Chapter 248 contained a provision that prohibited the HSCRC from setting rates for services rendered at Montebello until State law authorized the State Medical Assistance Program to reimburse UMMS at the Commission rates for those services and until the federal government agreed to accept those rates for purposes of federal financial participation in the State's Medical Assistance Program.
 II Consolidation of Montebello with Kernan
As we understand the facts, UMMS has been working since 1992 to consolidate all of its rehabilitation services. Toward that end, in March 1996, Montebello was merged with Kernan and relocated on Kernan's campus in a 128-bed, state-of-the-art rehabilitation facility that was built specially for Montebello.
Since Montebello's consolidation with Kernan, the HSCRC has regulated Montebello's rates. Because HSCRC rates generally include a provision for uncompensated care, the State's budgets for fiscal years 1998 and 1999 did not include any financial support to UMMS for uncompensated care at the new facility.[1]
As a result of the State's withholding of this financial support to Montebello in 1998, Kernan submitted a rate application to the HSCRC requesting $1.4 million in rates for uncompensated care. Although the HSCRC has approved an interim six-month rate increase to protect Kernan's financial viability, it questions the State's responsibility pursuant to ED, § 13-405 to provide future financial support for Montebello at Kernan. The HSCRC estimates that the annual funding requested would amount to $1,383,223 for uncompensated care and $1,398,700 for capital expenditures.
 III Continued Applicability of Chapter 248 to Kernan's Rehabilitation Facility
ED, § 13-405 requires that the State continue to subsidize uncompensated care at Montebello unless "[UMMS] no longer operates Montebello." Accordingly, your request raises the question whether UMMS's consolidation of the former Montebello operation with Kernan voided the State's obligations to UMMS.
As with any question of statutory construction, we are required to determine the General Assembly's intent. State v.Ghajari, 346 Md. 101, 115, 695 A.2d 143 (1997). In discerning this intent, "our first resort must be to the language of the statute itself." Board of County Commissioners v. BellAtlantic-Maryland, Inc., 346 Md. 160, 170, 695 A.2d 171 (1997). "Ordinarily, where the language is clear, our probe for legislative intent begins and ends." 346 Md. at 169. Such is not the case with Chapter 248, however, because the phrase "no longer operates Montebello" is susceptible to more than one interpretation.
Although Chapter 248 defined "Montebello" as "the Montebello Center," this provision is more in the nature of shorthand than of definition and, in any event, is of little assistance in determining the General Assembly's intent in using that term in ED, § 13-405(a)(2). See ED, § 13-401(c). While "Montebello Center" could refer to the actual Montebello physical plant located on the former Montebello site, it could also refer to Montebello's operation, characterized by its distinct function and patient population, name and location aside. This ambiguity in the language requires that we go further in discerning whether the relocation of Montebello and its consolidation with Kernan was the kind of event that the General Assembly intended would by itself nullify the State's obligations. See generally Kaczorowski v.City of Baltimore, 309 Md. 505, 525 A.2d 628 (1987). We conclude that it was not.
UMMS's relocation of the Montebello operation to a new building was entirely consistent with the General Assembly's objective in transferring Montebello to UMMS. A key purpose of the transfer was to allow UMMS to make Montebello a state-of-the-art rehabilitation facility. See Preamble to Chapter 248. This goal was assumed to require the building of a new facility. See UMMS's Fiscal Analysis, Comparison of 1990 Transfer Bill to 1992 Transfer Bill ("The facilities at Montebello have had minimal capital investment since their initial construction in 1957. UMMS still estimates that it will cost approximately $25 million to replace the entire facility. The State has agreed to provide following grants to UMMS for capital improvements. . . .") Accordingly, we cannot presume that the General Assembly intended that the State be released from its funding obligations solely on the basis that Montebello was relocated to a new facility.
Instead, the structure of Chapter 248 makes it more likely that the General Assembly intended that the State continue to subsidize uncompensated care at UMMS as long as UMMS continued to provide rehabilitation and chronic care services to the "historic Montebello service population." This reciprocal agreement is reflected in ED, § 13-402(d) (prohibiting UMMS from declining to serve the "historic Montebello service population" as long as the State reimbursed UMMS for uncompensated care at the facility) and § 13-405 (voiding the funding formula if UMMS ceased to operate Montebello).
We do not have data that permit us to compare the medical and demographic characteristics of the rehabilitation patients now served at the Kernan facility with the characteristics of the "historic Montebello service population." If it is the case, however, that Montebello at Kernan continues to serve Montebello's traditional population of Medicaid and self-pay patients transferred from University Hospital and the Shock Trauma Center, DHMH remains obligated to negotiate toward an agreement that would help defray UMMS' costs for uncompensated care.
The fact that Montebello's rates are now regulated by the HSCRC does not alter this analysis. Although the Fiscal Note on Senate Bill 373 reflects uncertainty as to how Montebello's rates would be set after the transfer, the General Assembly explicitly recognized the possibility that Montebello's rates would be set by the HSCRC. Compare Fiscal Note to Senate Bill 373 ("It is not anticipated that the HSCRC will regulate Montebello and set its service rate structure; however, because the legislation is silent, it is unclear how rates will be set.") with ED, § 13-405(f) (prohibiting the HSCRC from setting rates at Montebello until State law authorized the State Medical Assistance Program to reimburse UMMS at Commission rates and the federal government agreed to accept Commission rates in providing federal funds for the State Medical Assistance Program).[2] When Montebello was consolidated with Kernan, § 15-110 of the Health-General Article required that the State's Medical Assistance program reimburse Kernan at the rates set by the HSCRC. Accordingly, while the State, in its negotiations with UMMS, may take account of the fact that Kernan's rates now include a provision for uncompensated care at Montebello, Chapter 248 reflects no intent that HSCRC rate setting itself discharge the State's statutory commitment under ED, § 13-405(d)(6) to fund the "amount jointly agreed upon" after good-faith negotiation between DHMH and UMMS.[3]
 III Conclusion
In summary, it is our opinion that neither the transfer of Montebello to a new facility at Kernan nor the subsequent regulation of Montebello's rates by the HSCRC served to relieve the State of its statutory commitment to fund a negotiated amount for uncompensated care and capital costs for Montebello at Kernan, assuming that Montebello at Kernan continues to serve the historic Montebello service population.
Very truly yours,
 J. Joseph Curran, Jr. Attorney General
 Sandra Barnes Assistant Attorney General
__________________ Jack Schwartz Chief Counsel Opinions Advice
[1] Moreover, the budget for fiscal year 1997 did not include the payment of $5,000,000 provided for in ED, § 13-405(d)(5).
[2] We understand that the conditions of ED, § 13-405(f) have been satisfied.
[3] This payment provision, however, unlike the specific dollar amounts in ED, § 13-405(d)(1) through (5), does not mandate a particular level of budget bill funding binding on the Governor, even assuming that the negotiations between DHMH and UMMS result in an agreement. See 65 Opinions of the Attorney General 108, 110 (1980).
 *Page 121